UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Valancourt Books, LLC
2115 Bremo Road
Richmond VA 23230

     *Plaintiff,*

          v.

Karyn Temple Claggett, in her official capacity
as the Acting Register of Copyrights of the
U.S. Copyright Office
101 Independence Avenue SE
Washington, DC 20059;


Jefferson Beauregard Sessions III, in his
official capacity as Attorney General of the
United States
950 Pennsylvania Avenue NW
Washington, DC 20059,

     *Defendants.*

Civil Case No. _____

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

**INTRODUCTION**

1.     This lawsuit seeks to enjoin the federal government from demanding that book publishers give the government copies of all of their books, without compensation, on pain of massive financial penalties. This is an unconstitutional taking of private property without just compensation, in violation of the Fifth Amendment. It is also an unconstitutional burden on freedom of speech and of the press.

2.      The Copyright Act provides that anyone who publishes a new work eligible for copyright must deposit with the United States Copyright Office two copies of each work they publish. This requirement is a relic of a time when authors were required to affirmatively register their works in order to obtain copyright protection. Today, however, all original works are protected by copyright at the moment they are created, so the deposit requirement no longer operates as an element of a *quid pro quo*. There is no way for a publisher to opt-out of either the copyright system or the deposit requirement.

3.      Plaintiff Valancourt Books is a small, independent press that operates out of its owner's home. Valancourt publishes forgotten and neglected classic literature, operating on a print-on-demand model. Valancourt was unaware that it was legally obligated to deposit copies of every book it produced with the federal government until it received a written demand from the United States Copyright Office that it provide the government with copies of virtually every book in its catalog—341 in total—on pain of fines that could extend into six figures. Valancourt is now faced with an untenable choice: Comply with the Copyright Office's demand for its past publications and deposit copies of each book it publishes in the future (which would impose substantial burdens in terms of time and financial cost) or await a lawsuit from the Copyright Office seeking crippling fines. It therefore brings this action to clarify its rights and obligations under 17 U.S.C. § 407 and the Constitution of the United States.

**JURISDICTION AND VENUE**

4.      Plaintiff brings this civil-rights lawsuit pursuant to the Takings Clause of the Fifth Amendment to the United States Constitution; the First Amendment, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

5.      Plaintiff seeks injunctive and declaratory relief against the enforcement of the

U.S. Copyright Office's mandatory book deposit requirement, 17 U.S.C. § 407, and a declaration

that the requirement is unconstitutional under the First and Fifth Amendments to the United

States Constitution.

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

7.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

8.      Plaintiff Valancourt Books is a limited liability company organized under the

laws of Virginia. It is a resident of Richmond, VA.

9.      Defendant Karyn Temple Claggett is named in her official capacity as the Acting

Register of Copyrights and Director of the U.S. Copyright Office. That office is responsible for

enforcing the mandatory book deposit requirement and has threatened Valancourt Books with

fines for failing to comply with the statute. The Copyright Office is located in the District of

Columbia.

10.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the

United States and responsible for the administration of the United States Department of Justice.

The Department of Justice is the governmental entity that would be responsible for initiating a

lawsuit to enforce the fines threatened by the Copyright Office.

## FACTUAL ALLEGATIONS

### *Valancourt Books*

11.     Valancourt Books is a small, independent press located in Richmond, Virginia,

which publishes rare, neglected, and out-of-print fiction, including 18th century gothic novels,

Victorian horror novels, forgotten literary fiction, and early LGBT fiction.

12.     Valancourt was founded in 2005 by James Jenkins.

13.     In 2004, Jenkins was a recent law school graduate dissatisfied with the opportunities available in the competitive Seattle legal market. He ultimately decided to apply to graduate programs in French and English literature.

14.     Jenkins was required to write an essay to accompany his graduate school applications, and he wanted to write about an 18th-century gothic novelist who had long interested him—Francis Lathom.

15.     Unfortunately, it turned out that most of Lathom's works were available in only one location in North America, the University of Nebraska at Lincoln, and only on microfiche. Undeterred, Jenkins and his husband drove from Seattle to Lincoln, obtained copies of the microfiche of Lathom's work, along with some other interesting works, and returned to Seattle.

16.     It occurred to Jenkins that there was no reason that in the year 2004, with the availability of low cost, print-on-demand technology, it should be so difficult to access these classic works of literature. Jenkins thought there would be some interest in these old titles, so he decided to try publishing two of them himself: *The Animated Skeleton* (1798), an anonymous gothic novel, and Lathom's *The Castle of Ollada* (1795).

17.     Over the course of several months, Jenkins and his husband painstakingly typed out the manuscripts, using microfiche readers at the public library. They found a printing company willing to do small runs of 250 copies per book, and they released both novels in March of 2005.

18.     Jenkins named the fledgling operation "Valancourt Books." The name is a reference to both the dashing hero of Ann Radcliffe's 1794 novel *The Mysteries of Udolpho*, and to an essay by W.M. Thackeray during the Victorian era in which he laments that young readers

were no longer familiar with Radcliffe's works because, like many great novels, they were out of print. The name Valancourt therefore reflected the goal of resurrecting great, forgotten literature.

19.     After Valancourt published its first two books, all subsequent books were published 100% "on-demand," with each copy being printed in response to a specific order.

20.     Valancourt's publications immediately attracted the attention of scholars. The fourth book Valancourt published—the anonymous *The Cavern of Death* (1794)—was edited by Professor Allen Grove, of Alfred University. Many subsequent Valancourt books have also been edited by respected university professors.

21.     Valancourt was initially a side project for Jenkins. He continued to publish books while completing a Master's degree at the University of Chicago and while working for a nonprofit organization in Kansas City.

22.     Over the years, as Jenkins expanded Valancourt's catalog and refined his editing process, he was able to turn Valancourt into a profitable—yet small—independent press. In 2012, Jenkins decided to make Valancourt his full-time occupation.

23.     Today, Valancourt has over 400 books in its catalog, and it adds approximately 20 titles per year.

24.     Many of the books that Valancourt publishes are so rare that, prior to Valancourt's reprinting, they existed in only a handful of copies worldwide. Indeed, some books existed in just a single known copy.

25.     Valancourt's work has ensured not only that these works will survive, but also that they are widely available to anyone who wants to read them.

26.     Many of Valancourt's books are now taught in college literature courses, and Valancourt's work has won wide acclaim from publications such as *The Times Literary Supplement*, *The Washington Post*, and *The New York Times*.

27.     Although Valancourt has developed an enthusiastic following, it is not a high volume publisher. It is not unusual for Valancourt to sell only a few hundred copies of any particular title, though of course some titles sell more than that.

28.     In a previous era, it would not have been possible to profitably operate a press by selling such a small volume of books. Valancourt is only viable because of the advent of digital, print-on-demand publishing technology. Rather than producing a run of thousands of books and storing the inventory to fulfill future orders, Valancourt's books are printed one-at-a-time by a digital printing vendor. When a customer places an order, the vendor uses files provided by Valancourt to print a single bound volume to fulfill that order and ships the book directly to the customer.

29.     In order to turn a profit, Jenkins has had to keep overhead extremely low. He and his husband operate Valancourt out of their home, and they have no employees. Jenkins has edited several Valancourt titles himself and has recruited scholarly editors and commentators for others. He spends a substantial amount of time traveling for research and to attend and present at academic conferences in order to promote Valancourt's work and speak with prospective editors for new volumes.

30.     Many of the works that Valancourt publishes are older works in the public domain, though the editorial enhancements that Valancourt adds to the works—such as scholarly introductions and footnotes—are subject to U.S. Copyright protection.

*31.*     Other works that Valancourt publishes are more recent and therefore still subject to copyright protection even though they are out of print. For these titles, Jenkins frequently needs to spend considerable amounts of time tracking down the rightsholder or the rightsholder's heir in order to secure permission to republish the book.

### *The Mandatory Deposit Requirement*

32.     Federal law provides that "the owner of copyright . . . shall deposit [in the U.S. Copyright Office], within three months after the date of . . . publication . . . two complete copies of the best edition" of the published work. 17 U.S.C. § 407(a).

33.     If a copyright owner fails to provide the government with two copies of his work, he may receive a written demand from the Register of Copyrights.

34.     If the owner does not comply with the written demand within three months, he can be fined up to $250, plus the retail price of the work. 17 U.S.C. § 407(d).

35.     A "willful[] or repeated[]" failure to comply with a deposit demand can subject the copyright owner to a fine of up to $2,500.

36.     This mandatory deposit requirement is a relic of a time when copyright law in the United States functioned very differently. The requirement dates (in another form) to the first Copyright Act of May 31, 1790, ch. 15, § 3, 1 Stat. 124, 125. At that time, anyone wishing to claim the protection of copyright for his works was required to deposit one copy of the work with the clerk of the United Stated District Court, and another copy with the department of state. *See Wheaton v. Peters*, 33 U.S. 591, 592 (1834).

37.     The Supreme Court noted that the original Copyright Act was constitutional because the deposit requirement was simply a condition on the enjoyment of a government

benefit—copyright protection. *Id.* At that time, an individual could choose whether to give copies of his works to the government in exchange for copyright protection.

38.     The Copyright Act of 1976—which went into effect in 1978—changed everything, providing that federal copyright protection would extend to all works "fixed in any tangible medium of expression," 17 U.S.C. § 102(a), and that the initial owner of the copyright is the author. 17 U.S.C. 201(a). In other words, the moment you write something down, you own the copyright to that work (with some exceptions, most notably works made for hire). No affirmative act beyond the creation of a work is necessary to secure copyright protection.

39.     The 1976 Act introduced a new deposit requirement. Any copyright owner who published a work "with a notice of Copyright" was required to deposit two copies of the work with the Copyright Office. A failure to do so could be punished by a fine, though the Act clarified that the deposit requirement was not a "condition[] of copyright protection." So one could avoid the mandatory deposit requirement by electing not to assert that one's work was protected by copyright—even though it was in fact protected. Pub. L. No. 94-553.

40.     In 1988, Congress again amended the Copyright Act in order to bring the United States into full compliance with the Berne Convention for the Protection of Literary and Artistic Works. The Berne Convention, which was first signed in 1896, adopted a "moral rights" view of copyright, whereby authors own copyright the moment they create a work, without the need to comply with formal requirements such as registration or the publication of mandatory copyright notice. Although the United States had been gradually moving towards a moral rights copyright system, the 1988 amendments completed the transition by deleting numerous portions of the Act that required a "notice of copyright." Berne Convention Implementation Act of 1988, Pub. L. No. 100-568.

41.     As a result of these amendments, the mandatory deposit requirement is no longer limited to works published with a notice of copyright. Instead, all copyrightable works must now be deposited with the Copyright Office. This means that the system no longer functions as an exchange whereby someone who avails himself of the protection of the copyright system is required, in return, to give the government copies of his work. Instead, individuals are now protected by copyright, no matter what they do, and they are required to send copies of any copyrightable works to the government, no matter what they do.

42.     The Copyright Act provides that the "Register of Copyrights may by regulation exempt any categories of material from the deposit requirements of this section, or require deposit of only one copy or phonorecord with respect to any categories." 17 U.S.C. § 407(c). Pursuant to that authority, the register has exempted, for example: "greeting cards," "three-dimensional sculptural works," "tests, and answer material for tests," "advertising matter, including catalogs," and "electronic works . . . available only online." 37 C.F.R. § 202.19(c). The exemption for electronic works encompasses e-books, such as one might read on a Kindle.

43.     Although the author of a work is not required to take any affirmative steps to establish ownership over the work's initial copyright, the copyright must nonetheless be registered with the copyright office before the copyright owner can bring an action for infringement. *See* 17 U.S.C. §§ 411, 412.

44.     One condition of registering a copyright is depositing a copy of the original work with the Copyright Office, a condition which is satisfied by complying with the mandatory deposit requirement. 17 U.S.C. § 408(b). The Act makes clear, however, that registration is optional, and that it "is not a condition of copyright protection." 17 U.S.C. § 408(a).

*45.*     The Copyright Office employs a number of "Acquisitions Specialists" whose job responsibility is to contact publishers and demand that they comply with the mandatory deposit requirement. On information and belief, these written demand letters typically threaten fines for noncompliance.

### *The Valancourt Demand Letter*

46.     On June 11, 2018, Jenkins received an email at his Valancourt Books email address from the U.S. Copyright Office's Copyright Acquisitions Division. Exhibit A. The email contained two attachments.

47.     The first attachment was a letter addressed to Jenkins, from Michael Lind, an Acquisitions Specialist. Exhibit B. The letter stated:

> This document constitutes written demand for the required deposit, under section 407 of the copyright law . . . of one complete copy . . . of the best edition of the work(s) cited on the attached deposit notice(s), for the use or disposition of the Library of Congress. * * * To comply with this Notice and facilitate processing, please send the required copies of the best edition for each title and **enclose the corresponding deposit notices inside each shipment**. You must make the required deposit by the **Statutory Deadline Date of September 9, 2018.** Failure to comply will make you liable to the following penalties prescribed by the copyright law: (1) a fine of up to $250 per work, and (2) the total retail price of the copies demanded. Willful and repeated failure to comply could incure and additional fine of $2,500.

48.     The second attachment was 341 pages long—one page for every book the government was demanding Valancourt hand over, which was nearly every book Valancourt had ever published. It also instructed Jenkins to ship each book separately with a copy of the applicable notice.

49.      Jenkins was alarmed to receive these communications from the Copyright Office. Although he was familiar with the copyright registration process, he had been unaware of the

existence of the mandatory deposit requirement for all copyrightable materials, whether registered or not.

50.     As a small, print-on-demand publisher, Valancourt keeps no stock of its books on hand. In fact, the only way that Valancourt can obtain copies of its works is by ordering them from the printer through its own online retail portal.

51.      Jenkins replied to the email on June 12, 2018, explaining that complying with the request would cost "in excess of $2,500, an onerous and unreasonably burdensome sum for a small operation such as this one." He requested that the Copyright Office withdraw its demand. He also offered to sell copies of Valancourt's books to the Copyright Office "at our cost with no markup, if that would help." Exhibit C.

52.     Jenkins also pointed out that many of Valancourt's more recent titles were updated reprints of 20th-century books that would have been deposited with the Copyright Office with the Copyright Office when they were first published. Exhibit C.

53.     Jenkins further pointed out that "many of the books specified in your demand notice have previously been supplied by us to the Library of Congress in connection with the Cataloging-in-Publication program." Exhibit C.

54.     Jenkins' reference to the Cataloging-in-Publication program in his email was accurate: When he first began Valancourt Books, Jenkins had routinely provided the Library of Congress with free copies of Valancourt's books in exchange for a Library of Congress catalog control number. After depositing more than 100 titles, Jenkins determined that the cost of sending each new title to the Library of Congress was greater than the value the business obtained from the catalog control number, and he discontinued the practice.

55.    Two months after Jenkins' email, on August 9, 2018, the Copyright Office replied to that email. Exhibit D. In its email response, the Copyright Office took the position that Valancourt was required to deposit any book that contained any new "copyrightable" material and that any copies of books Valancourt had deposited in connection with the Cataloging-in-Publication program did not fulfill Valancourt's mandatory-deposit obligations because those books were provided "in exchange for" a prepublication catalog record instead of being provided purely for free. Exhibit D.

56.    The Copyright Office's August 9, 2018, email had two attachments: a new demand letter and a new PDF file listing each book demanded. Exhibit D. The new demand list contained only 240 books rather than the 341 books it initially demanded.

57.    It is not readily apparent how or why the Copyright Office chose the 101 books that it removed from its original demand.

58.    The new demand letter (like the original) urged Valancourt to avoid future threats or fines by "establish[ing] a regular procedure of sending one copy of each work immediately after publication to the Copyright Office." Exhibit E.

**<u>Injury to Plaintiff</u>**

59.    Complying with the Copyright Office's demands would cost Valancourt substantially more than one thousand dollars.

60.    Complying with the Copyright Office's demands would require a substantial amount of work over multiple days, ordering, packaging, and shipping hundreds of books.

61.    Complying with the Copyright Office's demand would necessarily divert resources from Valancourt's mission—preserving and disseminating lost and forgotten literature.

62.     If Valancourt were to disregard the demand, it would be subjected to fines that could stretch well into the six figures.

63.     Even complying with the Copyright Office's demands would not guarantee that Valancourt would be free from further demands for copies of books in its back catalog. The statute allows the Copyright Office to demand two copies of any copyrightable book, which means the Copyright Office could, at any time, request a second copy of any or all of the books it is demanding.

64.     Moreover, Valancourt is actively expanding its catalog every year. Valancourt intends to continue publishing multiple books per year, but it does not want to send copies of each new work to the Copyright Office. Jenkins' past experience participating voluntarily in the Calatoging-in-Publication program gives him direct knowledge that sending a copy of every single new title to the federal government is both expensive and time-consuming. Complying with the mandatory-deposit requirement on a forward-looking basis would result in at least hundreds of dollars in additional annual costs to Valancourt in addition to many hours of time diverted from its two-person staff's already limited resources.

## CONSTITUTIONAL VIOLATIONS

### Count I
**(Fifth Amendment to the U.S. Constitution: Taking of Private Property Without Just Compensation)**

65.     All preceding allegations are incorporated here as if set forth in full.

66.     The mandatory deposit requirement is unconstitutional under the Fifth Amendment to the United States Constitution, which requires the government to pay individuals just compensation whenever it requires them to hand over private property for public use.

67.    The 341 books that the Copyright Office has demanded from Valancourt for its own use are personal property, subject to the full protection of the Fifth Amendment.

68.    Whenever the government fully and physically appropriates property for its own use, there arises a *per se* duty to pay just compensation.

69.    This duty exists to ensure that the government does not force "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

70.    If the government wishes to acquire books, it should purchase them with funds raised through general taxation.

## Count II
### (First Amendment to the U.S. Constitution)

71.    All preceding allegations are incorporated here as if set forth in full.

72.    The mandatory deposit requirement is unconstitutional under the First Amendment to the United States Constitution, which provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press."

73.    The deposit requirement places a unique and special burden on specific forms of publishing (physical books), while exempting others such as e-books.

74.    The deposit requirement is overbroad, as it requires almost all works subject to copyright to be deposited with the Copyright Office, and almost everything that is written down is automatically subject to copyright.

75.    The deposit requirement imposes particularly heavy burdens on print-on-demand publishers, who have a higher marginal cost per work and who do not keep excess stock.

76.    The deposit requirement is unduly burdensome, as it imposes particularly heavy burdens on speakers who may wish to remain anonymous or who may wish to disseminate their

works narrowly. Speakers who are willing to deposit copies of their works with the government have many avenues to do so besides § 407.

77.     There is no government interest served by the deposit requirement that could not be served equally well by less restrictive means such as the government purchasing the works it desires or by relying on the many avenues (like the cataloging-in-publication program or the deposit requirement for publishers who wish to register their copyrights) by which the government can acquire works voluntarily.

78.     On information and belief, Defendants possess no evidence that the deposit requirement is necessary to achieve any substantial government interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request relief as follows:

A.      A declaratory judgment that: the mandatory deposit requirement is unconstitutional under the First and Fifth Amendments to the United States Constitution; Valancourt Books is not required to deposit any books with the Copyright Office free of charge; and Valancourt Books cannot be subjected to liability for failing to do so;

B.      A permanent injunction against enforcement of the mandatory deposit requirement;

C.      All further legal and equitable relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED this 16th day of August, 2018.

/s/ *Renée D. Flaherty*
Renée D. Flaherty (DC Bar No. 1011453)
Jeffrey Redfern (DC Bar No. 1018046)
Robert McNamara (VA Bar No. 73208)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Telephone: (703) 682-9320
Facsimile: (703) 682-9321
Email: rflaherty@ij.org; jredfern@ij.org;
rmcnamara@ij.org

*Attorneys for Plaintiffs*
*application for admission *pro hac vice* filed
concurrently with this document