**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **VALANCOURT BOOKS, LLC,** | ) | |
| | ) | **Civil Action No. 1:18-cv-01922-ABJ** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KARYN A. TEMPLE, in her official capacity** | ) | |
| **as Register of Copyrights, United States** | ) | |
| **Copyright Office** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STATUTORY AND REGULATORY BACKGROUND .................................................... 2

    I.    The Library of Congress and the Deposit Requirement ............................... 2

    II.   History of Deposit Provisions in Copyright Regimes.................................... 3

    III.  The Deposit Requirement in Its Current Form ............................................ 8

FACTUAL AND PROCEDURAL BACKGROUND..................................................... 10

ARGUMENT ................................................................................................................. 12

    I.    The Deposit Requirement in Section 407 Is Consistent With the Takings
           Clause as Applied to Plaintiff.................................................................... 12

          A.   Because the Deposit Provision Is a Condition on a Voluntarily-Sought
               Government Benefit, Its Operation Is Consistent With the Takings
               Clause...................................................................................... 12

          B.   Plaintiff Has Taken Voluntary Action to Receive the Benefits Afforded
               Under Federal Copyright Law, and Has Declined to Take Action to Opt
               Out of Receiving Such Benefits................................................... 19

    II.   The Deposit Requirement Is Consistent With the First Amendment .................... 24

          A.   The Deposit Requirement Does Not Place an Unconstitutional Burden
               on Speech.................................................................................. 25

               1.   A Mere Allegation That the Deposit Requirement May Burden
                     One Form of Media More Than Others, Even if Correct, Does
                     Not State a First Amendment Claim................................... 25

               2.   In the Alternative, the Deposit Requirement Satisfies
                     Intermediate Scrutiny as Applied to Plaintiff ..................... 29

          B.   The Deposit Requirement Is Not Facially Overbroad. ................. 32

CONCLUSION.............................................................................................................. 34

## INTRODUCTION

Section 407 of the Copyright Act—a requirement originating in the First Congress of the United States that was ultimately signed into law by President Washington—carries with it a strong presumption of constitutionality. And for good reason. In exchange for the panoply of benefits that the government grants owners of copyright, publishers that choose to participate in that system must deposit two copies of published works with the Library of Congress. Though amended repeatedly, this deposit requirement has formed a part of American law for over two hundred years, and was long ago recognized as valid by the Supreme Court. And the sole Court of Appeals to have analyzed constitutional claims akin to those asserted here concluded that they had no merit. The Court should decline the invitation to be the first to strike down this longstanding requirement.

The plaintiff in this action, a book publisher, contends that this longstanding requirement is inconsistent with the Takings Clause of the Fifth Amendment and the Free Speech Clause of the First Amendment. These constitutional claims have no merit. In considering the deposit requirement enacted by the First Congress, the Supreme Court explained that "when the legislature are about to vest an exclusive right in an author . . . they have the power to prescribe the conditions on which such right shall be enjoyed." *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 663-64 (1834). In the years since, that Court has reiterated that when Congress creates a statutory benefit, it preserves significant discretion to prescribe conditions to be satisfied by entities that take voluntary action to receive that benefit. Therefore, if a book publisher takes affirmative steps to avail itself of the benefits of the statutory copyright framework, and chooses not to opt out of those benefits, it must comply with the deposit requirement. Plaintiff acknowledges that it participates in this framework and it has never attempted to abandon its

copyright protections.  Its participation in this conditional exchange thus does not constitute an unlawful taking.

Additionally, as a reasonable condition placed on copyright protection, the deposit requirement raises no First Amendment concerns.  Even if Plaintiff were correct (though it is not) that the deposit requirement imposes a particular burden on one medium but not others, that would not state a meritorious First Amendment claim because the requirement has neither the purpose nor the effect of hindering the free exchange of ideas in any medium.  Defendants therefore respectfully request that the Court enter summary judgment in their favor.

## STATUTORY AND REGULATORY BACKGROUND

### I.      The Library of Congress and the Deposit Requirement

The Library of Congress is the world's largest library.  Joint Stipulations of Fact ("JSF") ¶ 31.[1]  It serves as the national library of the United States, functions as the main research arm of the U.S. Congress, and provides the public with a uniquely important repository of the nation's cultural output through general public access to its collections.  *Id.*  Since its founding in 1800, the Library's collection has grown to over 168 million items, including more than 39 million cataloged books and other print materials, as well as the world's largest collection of legal materials, films, maps, sheet music, and sound recordings.  *Id.*  A wide variety of people and organizations use the Library on a day-to-day basis—in fiscal year 2018, the Library responded to over one million requests from Congress, federal agencies, and the public.  *Id.*  The Library also makes cataloging information about the works in its collections publicly available online, facilitating their accessibility to publishers, researchers, students, and other users throughout the

---

[1] As explained below, *see infra* Factual and Procedural Background, the parties agreed to enter into stipulations of material facts in lieu of engaging in discovery.  The parties' Joint Stipulations of Fact is respectfully submitted herewith in lieu of a statement of material undisputed facts.

world.  *Id.* ¶ 34.  In addition to the United States Copyright Office, its components include the

Congressional Research Service, which provides authoritative research and analysis for

Congress, and the National Library Service for the Blind and Physically Handicapped, which

provides books in accessible formats to persons with disabilities.  *Id.* ¶ 31.

To provide its services, the Library adds approximately 10,000 items to its collections

each day.  *Id.* ¶ 32.  Many of these items are received under the deposit requirement of Section

407 of the Copyright Act of 1976, 17 U.S.C. § 407.  JSF ¶ 35.  In fiscal year 2017, the Copyright

Office transferred 172,777 physical book deposits to the Library of Congress, 35,554 of which

were received through the deposit requirement.  *Id.* ¶ 66.

## II.     History of Deposit Provisions in Copyright Regimes

Laws requiring the deposit of books and other cultural materials with a national or

university library "for the purpose of preserving the cultural achievements of a nation" have been

common in the West for centuries and have often been interwoven with copyright regimes.[2]

The earliest examples were associated with laws granting printing privileges, and copyright laws

adopted similar library deposit requirements.  Study No. 20, at 1.  A deposit requirement has

been part of the conditions of copyright protection since the first Congress, except for a brief

period in the nineteenth century.  *See*, *e.g.*, Copyright Act of May 31, 1790, 1 Stat. 124, 125

(1790); Act of Aug. 10, 1846, § 10, 9 Stat. 102, 106 (1846); Act of Mar. 3, 1891, § 3, 26 Stat.

1106, 1107 (1891); Copyright Act of 1909, § 9, 35 Stat. 1075, 1077 (1909).[3]

---

[2] Elizabeth K. Dunne, *Study No. 20: Deposit of Copyrighted Works* (1960), *reprinted in* Staff of
S. Comm. on the Judiciary, 86th Cong., *Copyright Law Revision: Studies Prepared for the
Subcomm. on Patents, Trademarks, and Copyrights of the Comm. on the Judiciary* 1,
https://www.copyright.gov/history/studies/study20.pdf ("Study No. 20").

[3] The requirement was repealed in 1859, but reinstated in 1865.  *See* Act of Mar. 3, 1865, 13
Stat. 540 (1865).

"Anglo-American copyright legislation begins in 1709 with the Statute of 8 Anne, c. 19." *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 647 (1943).  That statute included a deposit requirement similar to the one at issue here, directing book publishers to hold "nine copies of each book or books, upon the best paper" in reserve prior to publication "for the use of the royal library, the libraries of the universities of Oxford and Cambridge, the libraries of the four universities in Scotland, the library of Sion College in London, and the library commonly called the library belonging to the faculty of advocates at Edinburgh respectively . . . ."  Statute of Anne, 8 Ann., c. 19, § V (1710) (Gr. Brit.).  The Statute of Anne required delivery of a copy of the book to the library within ten days of a demand by that library.  If the publisher failed to comply, copyright protection was not forfeited; instead, the publisher was required to pay a fine. *See id*. (requiring non-complying publisher to pay "the value of the said printed copies" and "the sum of five pounds for every copy not so delivered, as also the value of the said printed copy not so delivered").  In 1775, English copyright law was amended to require the deposit of complete copies of works by making the registration and deposit of "the whole of such book, and every volume thereof" a condition of instituting a copyright infringement suit, in addition to the other penalties imposed by the Statute of Anne.  Copyright Act, 15 Geo. III, c. 53, § VI  (1775) (Gr. Brit.).

Against this historical background, Article I of the Constitution granted Congress specific power to enact copyright laws: "The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . ."  U.S. Const. art. I, § 8, cl. 8.  "All versions of the Copyright Act have been enacted pursuant to the power granted Congress" by this provision. *Ladd v. Law & Tech. Press*, 762 F.2d 809, 812 (9th Cir. 1985).

4

The First Congress initially exercised this power in an Act signed into law by President Washington on May 31, 1790 that provided federal copyright protection to books, maps, and charts, and that included a deposit requirement.  Copyright Act of 1790, § 1 Stat. 124, 125 (1790) (requiring that "the author or proprietor of any such map, chart, book or books, shall, within six months after the publishing thereof, deliver, or cause to be delivered to the Secretary of State a copy of the same, to be preserved in his office").  The Act made copyright protection available only upon this deposit of copies, providing that "no person shall be entitled to the benefit of this act . . . unless he shall first deposit" the required printed copy.  *Id*.  In 1834, the Supreme Court upheld this deposit provision as a constitutional condition of copyright protection.  *Wheaton*, 33 U.S. at 663-64 ("No one can deny that when the legislature are about to vest an exclusive right in an author or an inventor, they have the power to prescribe the conditions on which such right shall be enjoyed; and that no one can avail himself of such right who does not substantially comply with the requisitions of the law").  As a later Supreme Court explained, "[t]he construction placed upon the constitution by the first act of 1790 . . . , by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight, and when it is remembered that the rights thus established have not been disputed during a period of nearly a century, it is almost conclusive." *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884).

In 1846, the law establishing the Smithsonian Institution required that one copy of each copyrighted work be deposited in both the Smithsonian and the Library of Congress within three months of publication.  Act of Aug. 10, 1846, § 10, 9 Stat. 102, 106.  In 1865, the Librarian of Congress was empowered to demand copies of works not deposited within one month of publication; failure to deposit would result in forfeiture of copyright.  Act of Mar. 3, 1865, § 3,

13 Stat. 540, 540 (1865).  In 1867, a $25 fine was added as a penalty for noncompliance.  14 Stat. 395 (1867).

The Copyright Act of 1909 significantly liberalized the laws to benefit authors.  The 1909 Act required that "after copyright has been secured by publication of the work with [notice],[4] there shall be promptly deposited in the copyright office" two copies of the work, and gave the Register of Copyrights the authority to make a formal demand when deposit was not made, after which deposit would be required within three months, upon penalty of copyright forfeiture and a fine.  Copyright Act of 1909, §§ 12-13, 35 Stat. 1075, 1078.

In enacting Section 407 of the present Copyright Act in 1976 (and as subsequently amended), Congress decided that the sanction of forfeiture was too severe and could create a danger that one copyright owner's rights could be destroyed by another owner's failure to deposit.[5]  *See* H.R. Rep. No. 94-1476, at 150 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5766.  Thus, Congress decided to retain the fine and increased it to $250 per work, but opted to eliminate the forfeiture penalty.  Under the 1976 Act, "the owner of copyright or of the exclusive right of publication in a work published *with notice of copyright* in the United States shall deposit, within three months after the date of such publication[,] two complete copies of the best edition."  Copyright Act of 1976, § 407(a), 90 Stat. 2541, 2579, *codified at* 17 U.S.C. § 407(a) (1976) (emphasis added).  To make clear that forfeiture of copyright protection was no longer a

---

[4] Copyright notice generally consists of three elements included in a work: the copyright symbol ©, the word "copyright" or the abbreviation "copr."; the year of first publication of the work; and the name of the copyright owner.  *See* "Copyright Notice," https://www.copyright.gov/circs/ circ03.pdf.

[5] Under the 1976 Copyright Act, copyright ownership is divisible.  Any of the exclusive rights listed in 17 U.S.C. § 106 can be owned and enforced separately.  17 U.S.C. § 201(d).  *See* H.R. Rep. No. 94-1476, at 61.

consequence of a failure to deposit, the 1976 version of Section 407(a), like the present version, stated that the deposit requirement was not a "condition[] of copyright protection."  *Id*.

In 1985, a book publisher challenged this version of Section 407 under the Takings Clause and the First Amendment.  *See Ladd*, 762 F.2d at 810.  In rejecting the publisher's Takings Clause challenge, the Ninth Circuit observed that "Congress indubitably can place conditions on the grant of a statutory benefit."  *Id*. at 813.  The court noted that "publication with copyright notice" triggered the deposit requirement.  *Id*. at 814.  It rejected the argument that, in light of the statutory text, "the deposit requirement by its own terms is no longer a condition of copyright," instead explaining that "deposit is indeed still required of one obtaining a copyright, although protection of the copyright laws is not lost by failure to comply."  *Id*.  The Ninth Circuit considered that statutory text to constitute a repudiation of the requirement that copyright protection be forfeited unless deposit was made, rather than a statement divorcing copyright protection from the deposit requirement.  *See id*.

In 1988, Congress amended Section 407 to bring U.S. copyright law in line with the United States' international obligations under the Berne Convention for the Protection of Literary and Artistic Works.  *See* Berne Convention Implementation Act of 1988 ("BCIA"), 102 Stat. 2853 (1988); JSF ¶ 42.  The BCIA removed the phrase "with notice of copyright" from Section 407 to eliminate any prohibited formal barriers to copyright protection.  The relevant House Report explained that because "noncompliance with the mandatory deposit requirement does not result in forfeiture of any copyright protection, mandatory deposit is [compatible] with Berne."  H.R. Rep. No. 100-609, at 44 (1988) (attached as Ex. 1).  It further stated:

> Clearly, the mandatory deposit of all published works in which copyright is claimed advances the purposes of the Copyright Clause of the Constitution to promote the progress of science and the useful arts.  The existing mandatory deposit requirement was recently held to pass constitutional muster.  The elimination of copyright notice

> as a factor in subjecting works to mandatory deposit has no constitutional significance. It remains true that only those works published in the United States in which copyright is claimed are subject to mandatory deposit. The only change is that the law will no longer require affirmative marking of the copies as a condition of maintaining copyright.

*Id*. (citing *Ladd*, 762 F.2d 809).

### III.     The Deposit Requirement in Its Current Form

Section 407 of the Copyright Act currently states that except as exempted by the Register of Copyrights, "the owner of copyright or of the exclusive right of publication in a work published in the United States shall deposit, within three months after publication[,] two complete copies of the best edition" of the work with the Copyright Office "for the use or disposition of the Library of Congress." 17 U.S.C. § 407(a)-(b). The current law does not require deposit of the work before copyright protection vests. Rather, copyright protection attaches to copyrightable works automatically upon their fixation in a tangible medium of expression. *Id*. § 102(a).

If a copyright owner fails to affirmatively deposit copies of a work after publication (and if suitable copies have not otherwise been delivered to the Office through registration, *see infra* page 9), the Copyright Office can make a written demand for the deposit upon the publisher or copyright owner. If a demand has been made, the copyright owner or publisher has three months to comply before it becomes liable for fines and costs for the Library to purchase the work. 17 U.S.C. § 407(d). By regulation, the Copyright Office may exempt certain categories of works from the deposit requirement entirely or limit the deposit requirement to only one copy. *See id*. § 407(c); *see also* 37 C.F.R. § 202.19(c). For example, the Copyright Office has generally exempted most electronic works that are not published in physical formats (*i.e.*, works "available only online"). *Id*. § 202.19(c)(5).

A copyright owner that believes that it would be excessively burdensome to comply with a written demand can request a grant of "special relief" from the Copyright Office.  Under Copyright Office regulations, the Register of Copyrights may, after consultation with other appropriate officials of the Library, grant a request for special relief from Section 407 for a published work that is not otherwise exempt.  *Id*. § 202.19(e).  For example, special relief might permit deposit in a format that would not otherwise be considered the "best edition" of a work (*e.g.*, an electronic format).  JSF ¶ 58.  Consistent with its general practice, the Office has sometimes raised the option of special relief directly with copyright owners who express concerns regarding potential burdens.  *Id*. ¶ 59.  Publishers often request special relief to allow them to submit an electronic copy of a work rather than a physical deposit.  *Id*. ¶ 60.  The Copyright Office has multiple ongoing special relief agreements that permit this arrangement; in 2017 and 2018, the Copyright Office granted every such special relief request it received.  *Id*. ¶¶ 59-60.

Section 408 of the Copyright Act provides a copyright owner with additional statutory benefits, and also includes a separate deposit requirement that is a condition of receiving those benefits.  *See* 17 U.S.C. § 408; *see also* H.R. Rep. No. 94-1476, at 150 (noting that "deposit and registration [are] separate though closely related").  In particular, timely registration constitutes *prima facie* evidence of a copyright, registration is generally a prerequisite to the filing of a civil action for copyright infringement, and statutory damages are generally unavailable for pre-registration infringement.  17 U.S.C. §§ 410-12.  As a condition of registration, the copyright owner must generally deposit two complete copies of the best edition of a published work, although here, too, the Copyright Office has regulatory authority to permit the deposit of identifying material instead of a complete copy, or to require only one copy instead of two.  *Id*. §

408(b)(3).  Copies submitted for deposit under Section 407 may be used to also satisfy the
registration deposit requirement, if accompanied by a registration application and registration
fee.  *Id* § 408; 37 C.F.R. §§ 202.19(f)(1), 202.20(e).[6]

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff is a book publisher operating as a limited liability company in Richmond,
Virginia, which publishes rare and out-of-print fiction, including 18th century gothic novels;
Victorian horror novels; forgotten literary fiction; and early lesbian, gay, bisexual, and
transgender fiction.  JSF ¶ 4.  After Plaintiff published its first two books, all subsequent books
were published "on-demand," a publishing method where each copy is printed in response to a
specific order or request.  *Id.* ¶ 12.  Many of the works that Plaintiff publishes are older works in
the public domain, though the editorial enhancements that Plaintiff adds to the works—such as
scholarly introductions and footnotes—are subject to U.S. copyright protection if they contain
sufficiently creative subject matter.  *Id.* ¶ 24.

Plaintiff believes that all or nearly all books that it publishes, including each of the books
at issue in this case, contain copyrightable material and therefore all or nearly all of the books
that it publishes contain a copyright notice—that is, a statement (which is accurate to the best of
its knowledge) regarding the legal status of that material.  *Id.* ¶¶ 28-29.  Some of these books
also contain an express reservation of rights.  *Id.* ¶ 29.  For example, several of the books at issue
in this case contain the following statement: "All rights reserved.  The use of any part of this
publication reproduced, transmitted in any form or by any means, electronic, mechanical,
photocopying, recording, or otherwise, or stored in a retrieval system, without prior written

---

[6] As used herein, "deposit requirement" refers solely to Section 407.  Plaintiff has asserted no
challenge to the constitutionality of Section 408.

consent of the publisher, constitutes an infringement of the copyright law." *Id.*  Where this statement appears in one of Plaintiff's publications, Plaintiff believes it is an accurate statement of the law to the best of its knowledge.  *Id.*  Plaintiff has taken no steps to abandon or disclaim any of its copyrights in the books it publishes.  *Id.* ¶ 30.

The Copyright Office determined that Plaintiff's books warranted inclusion in the Library's collections due in part to their historical significance.  *Id.* ¶ 70.  In June 2018, the Office sent an email to Plaintiff requesting the deposit of 341 published books; the email included notices for deposit for each work, and stated that if Plaintiff was unable to supply any individual book, it should return the notice(s) with a written explanation.  *Id.* ¶¶ 71-73 & Exs. A-C.  Plaintiff responded via email, stating that it did not keep excess physical copies of its books because of its print-on-demand business model, and that printing and shipping the requested books would be cost-prohibitive.  *Id.* ¶ 76 & Ex. D.  Plaintiff also stated that it had already provided some of the works to the Library in connection with a voluntary program known as the Cataloging in Publication program.  *Id.* at Ex. D.

After receiving Plaintiff's response, the Copyright Office consulted publicly-available online sources in an effort to ensure its demand was limited to books containing newly-added material.  *Id.* ¶ 77.  In August 2018, the Office replied to Plaintiff, explaining that it had reviewed Plaintiff's titles and determined that some of the books appeared to be strictly reprints of public domain material (which were therefore no longer requested).  *Id.* ¶ 78-79 & Exs. E-G. However, the Office also explained that other books published by Plaintiff contained additional materials such as new introductions or other new materials, and thus contained copyrightable material subject to the deposit requirement.  *Id.* at Ex. E.  The reply included a new demand letter for 240 books, which was narrowed from the original request for 341 titles because some of

these titles were either comprised entirely of public domain material or had been previously provided to the Copyright Office. *Id.* ¶ 79 & Exs F-G.  In March 2019, the Copyright Office and the Library informed Plaintiff that they are willing to accept electronic copies of the books listed in this most recent demand letter in lieu of physical copies. *Id.* ¶ 61.

Plaintiff filed the present action on August 16, 2018.  Plaintiff's Complaint contends that the deposit provision is inconsistent with the First and Fifth Amendments.  In lieu of engaging in discovery, the parties have agreed to enter into stipulations of material facts.  *See* Joint Status Report, ECF No. 16 (informing the Court that the parties had completed their fact stipulations).

**ARGUMENT**

**I.      The Deposit Requirement in Section 407 Is Consistent with the Takings Clause as Applied to Plaintiff.**

Count I of the Complaint alleges that the deposit requirement constitutes an unlawful taking as applied to Plaintiff.  Compl. ¶¶ 65-70.  This claim has no merit because the deposit requirement is a condition on the provision of a voluntarily-sought government benefit rather than a taking without just compensation.  *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984); *Ladd*, 762 F.2d at 813-14.

**A.      Because the Deposit Provision Is a Condition on a Voluntarily-Sought Government Benefit, Its Operation Is Consistent With the Takings Clause.**

The Fifth Amendment provides in relevant part that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  However, the Supreme Court has held that Congress may condition the provision of a voluntarily-sought government benefit on the furnishing of certain private property if that condition rationally relates to a legitimate government interest.  *Monsanto*, 467 U.S. at 1004-08.  Because the deposit requirement constitutes such a condition, no taking without just compensation has occurred (or will occur).

12

Dating back to the first Congress in 1790, a deposit requirement has been part of the conditions of copyright protection, except for a brief period in the nineteenth century.  *See, e.g.*, Copyright Act of May 31, 1790, 1 Stat. 124, 125 (1790); Act of Aug. 10, 1846, § 10, 9 Stat. 102, 106 (1846); Act of Mar. 3, 1891, § 3, 26 Stat. 1106, 1107 (1891); Copyright Act of 1909, § 9, 35 Stat. 1075, 1077 (1909).  As part of the statutory copyright framework, Congress has required copyright owners such as Plaintiff, who receive a limited monopoly, to comply with the deposit provision.  In upholding the version of the provision contained in the earliest federal copyright statute, the Supreme Court explained that the right to copyright protection "does not exist at common law" but instead originated "under the acts of congress," and "[n]o one can deny that when the legislature are about to vest an exclusive right in an author or an inventor, they have the power to prescribe the conditions on which such right shall be enjoyed; and that no one can avail himself of such right who does not substantially comply with the requisitions of the law." *Wheaton*, 33 U.S. at 663-64.  As the D.C. Circuit has explained in upholding another copyright provision traceable to the Copyright Act of 1790, "[t]he construction of the Constitution 'by [those] contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight, and when it is remembered that the rights thus established have not been disputed [for this long], it is almost conclusive.'" *Eldred v. Reno*, 239 F.3d 372, 379 (D.C. Cir. 2001) (quoting *Burrow-Giles*, 111 U.S. at 57), *aff'd*, 537 U.S. 186 (2003).

The versions of the deposit requirement contained in the statutes enacted and amended since 1790 have retained this core feature that only copyright holders are subject to the deposit requirement.  It remains the case, as in 1834, that "no one can avail himself of [the] right [to

13

copyright protection] who does not substantially comply" with the deposit requirement. *Wheaton*, 33 U.S. at 664. As relevant here, Congress has altered the statute only to benefit the copyright holder by relaxing the consequence such that failure to deposit the requisite copies does not result in forfeiture of a copyright holder's statutory benefit, but instead subjects the holder to a financial penalty. *See Ladd*, 762 F.2d at 813. This ameliorative change, which benefits the copyright holder, does not render inapplicable the Supreme Court's holding that Congress may "prescribe the conditions on which [a statutorily vested] right shall be enjoyed," much less render the statute unconstitutional. *Wheaton*, 33 U.S. at 664. The structure is fundamentally the same: under the current deposit provision, like the original one, the copyright holder is still faced with the choice to comply with the deposit requirement in exchange for the statutory benefits offered by the Copyright Act, or divest copyright protection in the published work and be excused from the deposit requirement.

More recently, in *Monsanto*, the Supreme Court rejected a challenge to a comprehensive regulatory statute that mandated that companies provide certain trade secrets to a federal agency in exchange for the ability to receive economic benefits of registering certain pesticides for sale in interstate commerce. The court concluded that "as long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate Government interest, a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking." *Monsanto*, 467 U.S. at 1007 (citations omitted).

Similarly, here, Congress has enacted a comprehensive statutory framework, and the furnishing of certain personal property (two copies of a copyrighted work) is part of the exchange for a voluntarily-sought government benefit (copyright protection). The Constitution

14

grants Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. art. I, § 8, cl. 8.  The Supreme Court has long recognized that copyright legislation, dating back to the Copyright Act of 1790, provides a statutory benefit that would not otherwise exist at common law.  *See Wheaton*, 33 U.S. at 661 ("Congress, then, by [the Copyright Act of 1790], instead of sanctioning an existing right, as contended for, created it.").  Congress may lawfully condition the voluntary enjoyment of this statutory right on the deposit of two copies of the work with the Library of Congress.  As discussed below, *see infra* I.B, Plaintiff voluntarily availed itself of the protection of the copyright framework created by Congress, and has taken no steps to affirmatively disclaim the statutory benefits offered; it is thus validly subject to the conditions Congress places on the enjoyment of such benefits.

In light of *Wheaton* and *Monsanto*, the Ninth Circuit previously rejected a similar takings challenge brought by a publisher seeking to invalidate the deposit requirement following a statutory amendment.  In *Ladd*, the Ninth Circuit explained that "Congress indubitably can place conditions on the grant of a statutory benefit," and thus agreed with the government's argument that the provision "is not a taking" but "a condition which Congress may legitimately attach to the grant of a benefit."  762 F.2d at 813.  Thus, "[b]y voluntarily choosing to avail itself of the benefit," the publisher "ha[d] accepted the condition of deposit."  *Id.*  The court determined that the deposit provision was rationally related to the benefit of copyright protection because "[t]he Copyright Clause grants copyright protection for the purpose of promoting the public interest in the arts and sciences," and "[c]onditioning copyrights on a contribution to the Library of Congress furthers this overall purpose."  *Id.* at 814.

15

As the Ninth Circuit also recognized in *Ladd*, the constitutional analysis is not altered by the fact that the deposit requirement "by its own terms is no longer a condition of copyright," in the sense that a copyright cannot be forfeited by failure to deposit the work. *Id.* The Ninth Circuit explained that the deposit requirement forms part of a broader exchange for a statutory benefit, and that Congress's statement that deposit is no longer a condition of copyright merely reflects a change in "the method by which the deposit requirement is enforced." *Id.* As such, "a complete reading of section 407 reveals that deposit is indeed still required of one obtaining a copyright, although protection of the copyright laws is not lost by failure to comply." *Id.*; *see* S. Rep. No. 100-352, at 45 (1988) ("[A]lthough deposit is not a condition of copyright protection, it is, in a sense, an element of the 'quid pro quo' paid by authors and copyright owners for the benefits they enjoy as copyright proprietors."), *reprinted in* 1988 U.S.C.C.A.N. 3706, 3742. As the Ninth Circuit recognized, Congress altered the penalty not to change the fundamental bargain of the copyright framework, but rather to improve the effectiveness of the deposit requirement, concluding that the prospect of "[a] realistic fine," together with other statutory incentives, "seems likely to produce a *more effective* deposit system." *Ladd*, 762 F.2d at 813 (quoting H.R. Rep. 94-1476, at 150) (emphasis added). "[D]eposit is still required, but failure to deposit results not in forfeiture but in fines in the amount of the cost to the library of obtaining the work plus penalties." *Id.*[7] A fine has long been associated with a failure to deposit. *See, e.g.*, 14 Stat. 395 (1867).

---

[7] Nor, as the Ninth Circuit explained, is this conclusion inconsistent with Section 407(a)'s statement that "[n]either the deposit requirements of this subsection nor the acquisition provisions of subsection (e) are conditions of copyright protection." *See Ladd*, 762 F.2d at 814. The deposit requirement is a condition on copyright protection in the sense that it applies only to copyright owners. And the quoted section of Section 407(a) simply makes clear that forfeiture of copyright protection is no longer a permissible sanction for a failure by a copyright owner to make a required deposit upon demand.

In short, while the deposit requirement may be viewed as more lenient from the standpoint of the copyright owner because forfeiture is no longer a sanction for noncompliance, the statutory framework of copyright protection still connects the requirement to the benefits of copyright protection.  And because Congress has "vest[ed] an exclusive right in an author," it "ha[s] the power to prescribe the conditions on which such right shall be enjoyed," including the deposit requirement.  *Wheaton*, 33 U.S. at 663-64.  The condition remains in place; the penalty for failing to comply has simply become less onerous.  But the fact that a statutory enforcement mechanism has changed does not transform a statute that is constitutional to one that is not.[8]

The only relevant difference between the version of Section 407 at issue in *Ladd* and the current version is that the latter no longer applies only where copyright owners include a notice of copyright.  But the relaxation of formality requirements achieved by the 1988 Berne Amendments does not alter the fundamental nature of the federal copyright framework.  The 1988 amendments were intended to make it easier for authors to obtain copyright protection, and not to change the fundamental quid pro quo of the statutory scheme laid out by Congress.  They reflect a "minimalist approach" that "amend[ed] the Copyright Act only where there [was] a clear conflict with the express provisions of the Berne Convention" and "only insofar as it [was] necessary to resolve the conflict in a manner compatible with the public interest, respecting the pre-existing balance of rights and limitations in the Copyright Act as a whole."  H.R. Rep. No.

---

[8] An analogous statutory framework helps demonstrate why this is the case.  The federal government (along with most states) compiles names from voter registration records to create jury lists.  *See* 28 U.S.C. § 1863(b)(2) (requiring U.S. district courts to select the names of prospective jurors from voter registration lists).  Bestowal of a government benefit (the ability to vote in a specific election) is thus combined with a condition (inclusion in jury pools).  Failure to report for jury duty can be penalized by a fine, imprisonment, or community service, *see id*. § 1866(g), but not by forfeiture of the right to vote.  Yet it would be correct to describe the ability to vote in a particular election as being conditioned on the voter's inclusion in jury pools.

100-609, at 20.  Congress prospectively abolished the mandatory requirement of notice of copyright, but "[i]n deference to the utility of notice, . . . the legislation includes a new provision designed to stimulate voluntary notice by according evidentiary significance to its use."  *Id.* at 45.  Under this new provision, if a notice of copyright appears on a published work, then no weight is given to a defendant's use of a defense based on innocent infringement to mitigate damages.  17 U.S.C. § 401(d).  But as Congress made clear, "[t]he elimination of copyright notice as a factor in subjecting works to mandatory deposit has no constitutional significance," as it "remains true that only those works published in the United States in which copyright is claimed are subject to mandatory deposit."  H.R. Rep. No. 100-609, at 44.  "The only change is that the law will no longer require affirmative marking of the copies as a condition of maintaining copyright."  *Id.*

Consequently, the modification of the copyright-notice requirement does not change the fundamental balance of the federal copyright framework.  *See also Kahle v. Ashcroft*, No. C-04-1127 MMC, 2004 WL 2663157, at *16-18 (N.D. Cal. Nov. 19, 2004) (rejecting contention that recent amendments to the Copyright Act, including amendment of deposit requirement, had altered the traditional contours of copyright protection), *aff'd*, 487 F.3d 697 (9th Cir. 2007).  The copyright holder is still faced with the quid pro quo that the Supreme Court blessed in *Wheaton*: either choose to deposit copies with the Library and enjoy the protection of copyright or divest oneself of the copyright interest and thereby forego the protection of the statutory framework along with the accompanying obligation to deposit.  Forfeiture no longer occurs by operation of statute if the copyright holder declines to deposit, but the deposit requirement remains a condition attached to the enjoyment of the statutory benefit of copyright protection, a benefit that Plaintiff here clearly intended to avail itself of with regard to the publication of its works.

18

**B.      Plaintiff Has Taken Voluntary Action to Receive the Benefits
Afforded Under Federal Copyright Law, and Has Declined to Take
Action to Opt Out of Receiving Such Benefits.**

There is no question that the plaintiff here intends to avail itself of the statutory benefits

vested in copyright holders by Congress.  Plaintiff's works are published with notice of

copyright (even though such notice is not required to enjoy copyright protection), Plaintiff has

taken no steps to abandon the copyrights in those works, and Plaintiff's organization is structured

in order to vest copyright with it as the publisher.  Like the publisher in *Ladd*, Plaintiff has

"voluntarily cho[sen] to avail itself of the benefit" afforded by copyright protection, and has

thereby "accepted the condition of deposit."  762 F.2d at 813.

The requirement to deposit copies of a published work with the Copyright Office falls on

"the owner of copyright or of the exclusive right of publication in a work published in the United

States."  17 U.S.C. § 407(a).  As a general rule, "[c]opyright in a work protected under [the

Copyright Act] vests initially in the author or authors of the work."  *Id*. § 201(a).  However,

copyright ownership can be transferred by contract.  *Id*. § 201(d).  Moreover, for "work[s] made

for hire," "the employer or other person for whom the work was prepared is considered the

author . . . , and unless the parties have expressly agreed otherwise," owns the copyright.  *Id*. §

201(b).  A "work made for hire" includes "a work specifically ordered or commissioned for use

. . . as a supplementary work" and "a work prepared by an employee within the scope of his or

her employment."  *Id*. § 101.  In turn, a "supplementary work" is "a work prepared for

publication as a secondary adjunct to a work by another author for the purpose of introducing,

concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the

other work, such as forewords [and] afterwords [and] editorial notes . . ."  *Id*.

19

As an artificial legal entity (a limited liability corporation), Plaintiff does not become an "author" by creating copyrightable works itself.  Instead, Plaintiff's ownership of copyright or the exclusive right to publish necessarily results from a voluntary contractual undertaking: namely, agreeing that another person or entity will create copyrightable works to which Plaintiff owns the copyright or exclusive right to publish.  Plaintiff has no employees.  JSF ¶ 23. Therefore, Plaintiff's ownership of copyright cannot result from the preparation of a copyrightable work by an employee acting within the scope of his or her employment.  Instead, Plaintiff's copyright ownership can only result from (1) express transfer by contract or (2) an agreement with another person or entity to produce a supplementary work for Plaintiff.

For older works in the public domain, Plaintiff typically recruits scholarly editors and commentators to edit the works—adding editorial enhancements such as scholarly introductions and footnotes—and then Plaintiff republishes the works.  JSF ¶¶ 23-24.  These editorial enhancements are subject to copyright protection.  *Id.* ¶ 24.  If Plaintiff's agreements with these editors and commentators expressly transfer ownership of copyright in these editorial enhancements to Plaintiff, then Plaintiff has received copyright ownership via express assignment.  *See* 17 U.S.C. § 201(d) (authorizing copyright transfer by contract).  Alternatively, if these agreements do not contain such an express provision, then copyright ownership occurs by operation of law because these enhancements constitute "supplementary works," and as "the person for whom the work [was] prepared," Plaintiff "is considered the author" of these enhancements.  *Id.* §§ 101, 201(b).  But in either circumstance, the means by which Plaintiff acquires copyright ownership is via contract.  Similarly, for more recent works not in the public domain, Plaintiff must secure permission from a rightsholder or the rightsholder's heir to

20

republish the book.  JSF ¶ 25.  And again, the only avenue by which Plaintiff can acquire such ownership is by contract.

Consequently, as applied to Plaintiff, the federal copyright framework constitutes a voluntary exchange with the government, rather than an obligation imposed on an ordinary use of its property.  Even though loss of copyright is no longer a potential sanction for failure to make required deposits, Plaintiff's obligation to deposit copies results from its voluntary decision to obtain the benefits associated with copyright protection by means of a voluntary act: the formation of a contract relationship.  Plaintiff has therefore "voluntarily cho[sen] to avail itself of the benefit" afforded by copyright protection, and has thereby "accepted the condition of deposit."  *Ladd*, 762 F.2d at 813.

Additionally, to the best of the parties' knowledge, each of the books at issue in this case contains a notice of copyright.[9]  JSF ¶ 29.  As explained by Congress, providing copyright notice serves several purposes, including "inform[ing] the public as to whether a particular work is copyrighted," and identifying the copyright owner and showing the date of publication.  H.R. Rep. No. 94-1476, at 143; *see also Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004) (explaining that "[t]he function of copyright notice is to warn off copiers") (citing authority).  As explained above, *see supra* Statutory and Regulatory Background at II, notice of copyright is no longer required.  Thus, by voluntarily including a notice of copyright in each of the published works at issue, Plaintiff took an affirmative step to invoke the benefits of copyright protection.

---

[9] Some of these books also contain an express reservation of rights.  For example, several of the books at issue contain the following statement: "All rights reserved.  The use of any part of this publication reproduced, transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, or stored in a retrieval system, without prior written consent of the publisher, constitutes an infringement of the copyright law."  JSF ¶ 29.

This fact underscores that Plaintiff has opted into a special government benefits framework and has not had the benefits and burdens of copyright protection unwillingly foisted on it.

In addition to taking voluntary action to receive the benefits afforded by federal copyright law, Plaintiff has declined to opt out of receiving such benefits.  The Copyright Act broadly permits the transfer of copyrights, in whole or in part.  *See* 17 U.S.C. § 201(d) ("The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law . . . .").  It is also "well settled that rights gained under the Copyright Act may be abandoned" by means of "some overt act indicating an intention to abandon that right." *Micro Star v. Formgen Inc*., 154 F.3d 1107, 1114 (9th Cir. 1998); *see also* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.06 (2019) (analyzing cases discussing abandonment through overt acts manifesting "an intent by the copyright proprietor to surrender rights in his work").  A publisher that abandons or transfers copyright protection in a work is not subject to the deposit requirement because it is no longer "the owner of copyright or of the exclusive right of publication" in that work.  17 U.S.C. § 407(a).  Here, Plaintiff could have taken steps to divest its copyright interest, including by notifying the Copyright Office that it was abandoning its copyright (or that it was otherwise not the owner of copyright or the exclusive right of publication) and would allow the Office to record a document to that effect.  The Office would withdraw a demand for deposit from a publisher that provides such a response to a demand letter.  Therefore, having made the voluntary decision to retain the special benefits of copyright protection by declining to opt out from such protection, Plaintiff must comply with the deposit requirement as part of the statutory framework.

Furthermore, as the Ninth Circuit has held, the deposit requirement is rationally related to a legitimate government interest.  *Ladd*, 762 F.2d at 814; *see Monsanto*, 467 U.S. at 1004-08

(holding that conditions on government benefits do not violate the Takings Clause if they are rationally related to a legitimate government interest).  The Copyright Clause "grants copyright protection for the purpose of promoting the public interest in the arts and sciences," and "[c]onditioning copyrights on a contribution to the Library of Congress furthers this overall purpose."  *Ladd*, 762 F.2d at 814.  The statutory copyright framework provides an economic benefit to encourage authors to make their works available for the benefit of the public.  *See Luck's Music Library, Inc. v. Ashcroft*, 321 F. Supp. 2d 107, 112 (D.D.C. 2004) (Constitution's Intellectual Property Clause "is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of the exclusive control has expired") (quoting *Sony Corp. of Am. v. Universal Studios, Inc*., 464 U.S. 417, 429 (1984)), *aff'd*, 407 F.3d 1262 (D.C. Cir. 2005).  The Library acts as a physical manifestation of that exchange by aggregating works for use by the general public.

The Supreme Court's decision in *Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015), is not to the contrary.  In that case, the Court did not consider the provisions of the Agricultural Marketing Agreement Act that required raisin farmers to set aside a percentage of their crop in order to increase the market price of raisins to be the kind of voluntary exchange at issue here.  *Id*. at 2430-31 ("Selling produce in interstate commerce, although certainly subject to reasonable government regulation, is . . . not a special governmental benefit that the Government may hold hostage, to be ransomed by the waiver of constitutional protections.").  The Court specifically distinguished *Monsanto* on the grounds that "as a condition to receiving a permit to sell [their] products," the plaintiffs in that case "received a 'valuable Government benefit' in exchange."  *Id*. at 2430.  Unlike here, the raisin penalty in *Horne* was wholly involuntary.  The

23

Supreme Court specifically rejected the notion that "raisin growers voluntarily choose to participate in the raisin market," reasoning that "[s]elling produce in interstate commerce" was a "basic and familiar use[] of property." *Id.*; *see also id.* (describing renting property or building on property as other such familiar uses).

In contrast to participation in the agricultural market, however, the Supreme Court has long emphasized that the limited monopoly rights of copyright protection are a statutory benefit rather than a common-law right, and publishers and authors may participate in the market and produce works without its enjoying its benefits. *See, e.g.*, *Wheaton*, 33 U.S. at 657.  Thus, as demonstrated above, and as held in *Ladd*, the deposit requirement "is a condition which Congress may legitimately attach to the grant of a benefit," 762 F.2d at 813, akin to the condition upheld in *Monsanto*.  *See also Southeast Ark. Hospice, Inc. v. Burwell*, 815 F.3d 448, 450 (8th Cir. 2016) (rejecting takings claim by operator of hospice care facilities who "voluntarily chose to participate in the Medicare hospice program" and distinguishing *Horne*).

The Supreme Court has thus made clear that Congress may place conditions on the grant of a valuable government benefit, and if an entity takes voluntary action to receive that benefit and declines to take affirmative steps to opt out of receiving it, it must comply with the conditions in exchange for receiving the benefit.  Plaintiff has taken affirmative steps to receive the benefits bestowed by the federal copyright framework and has declined to take action to opt of the receipt of those benefits.  Congress may therefore condition Plaintiff's receipt of copyright benefits on compliance with Section 407.

## II.     The Deposit Requirement Is Consistent With the First Amendment.

Plaintiff also argues that the deposit requirement is inconsistent with the First Amendment, for two reasons.  First, Plaintiff contends that the deposit requirement places an

unconstitutional burden on speech.  Second, Plaintiff claims that the requirement is

constitutionally overbroad.  Neither claim has merit.

> **A.     The Deposit Requirement Does Not Place an Unconstitutional Burden on
> Speech.**
>
> > **1.     A Mere Allegation That the Deposit Requirement May Burden
> > One Form of Media More Than Others, Even if Correct, Does Not
> > State a First Amendment Claim.**

Like Plaintiff, the publisher in *Ladd* "argue[d] that the deposit requirement violates the

first amendment because it burdens material protected by the first amendment."  762 F.2d at 815.

As noted above, neither the First Congress nor the Supreme Court found any First Amendment

problem with the deposit requirement, which was enacted contemporaneously with the Bill of

Rights.  Because a copyright holder remains free to publish works without the statutory benefits

associated with copyright protection, the deposit requirement enacts no burden on any First

Amendment activity, nor does it impose any content-based requirements on publishers that

would run afoul of the First Amendment.

This case involves neither taxation nor content-based discrimination.  In *Leathers v.

Medlock*, 499 U.S. 439 (1991), the Supreme Court made clear that not all laws that touch upon

First Amendment activity are constitutionally suspect.  The Court upheld "the constitutionality of

a state sales tax that exclude[d] or exempt[ed] certain segments of the media, but not others."  *Id.*

at 441.  The Arkansas tax scheme at issue exempted newspapers, magazines, and satellite

broadcasting services, but not cable television services, from a general state sales tax.  *Id.* at 442.

The Court rejected the argument by a cable operator that a tax that "discriminates among media"

or "discriminate[s] . . . within a medium," "even in the absence of any evidence of intent to

suppress speech or of any effect on the expression of particular ideas, violates the First

Amendment," and explained that "[o]ur cases do not support such a rule."  *Id.* at 449-50.  After

analyzing *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), *Mabee v. White Plains Publishing Company*, 327 U.S. 178 (1946), and *Oklahoma Press Publishing Company v. Walling*, 327 U.S. 186 (1946), the Court announced that "[t]aken together, [these cases] establish that differential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas." *Leathers*, 499 U.S. at 453.

In *Ladd*, the publisher "attempt[ed] to characterize deposit as an insidious tax on first amendment protected works," analogizing to *Minneapolis Star & Tribune Company v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), in which the Supreme Court had invalidated a special-use tax on paper and ink affecting only large newspapers. *Ladd*, 762 F.2d at 815. The Ninth Circuit rejected this argument, concluding that "the deposit requirement does not burden the first amendment concerns of expression and dissemination of ideas." *Id.* (citation omitted). The court's conclusion followed from the fact that "[d]eposit is not triggered by the publication of ideas," but instead "comes into play only if the publisher voluntarily seeks the statutory benefit of copyright." *Id.* And because "[t]he first amendment does not protect the right to copyright," "a condition placed on copyright protection does not implicate first amendment rights." *Id.* (footnote omitted). *Ladd* is thus comparable to *Leathers*, in which the Supreme Court explained that although the danger of suppressing ideas was presented in *Minnesota Star* and *Arkansas Writers' Project v. Ragland*, 481 U.S. 221 (1987), such "[was] not the case" in *Leathers* because Arkansas "ha[d] chosen simply to exclude or exempt certain media from a generally applicable tax." *Leathers*, 499 U.S. at 453.

For the same reasons, Plaintiff's contention that the deposit requirement implicates First Amendment rights has no merit. Because Plaintiff has voluntarily sought the benefits of

copyright, and because the deposit requirement is a reasonable condition placed on copyright

protection—a statutory benefit that is not constitutionally required—the requirement raises no

First Amendment concerns.  *See Authors League of Am., Inc. v. Ass'n of Am. Publishers*, 619 F.

Supp. 798, 807 (S.D.N.Y. 1985) ("[T]he first amendment does not preclude the government from

imposing conditions on authors who seek copyright protection."), *aff'd sub nom. Authors League

of Am., Inc. v. Oman*, 790 F.2d 220 (2d Cir. 1986).  At issue in *Authors League* was a since-

repealed condition on copyright that restricted the importation of copyrighted non-dramatic

literary works not manufactured in the U.S. or Canada.  790 F.2d at 221.  As with the deposit

requirement, non-compliance with this manufacturing condition did not divest copyright

protection.  *See* 619 F. Supp. at 808 n.14.  The *Authors League* plaintiffs argued that that

condition "unconstitutionally interfere[d] with an author's first amendment right to distribute and

circulate ideas as well as the public's right to receive those ideas."  790 F.2d at 222.  The Second

Circuit rejected this argument, agreeing with the government that "since free importation is

allowed to any author who agrees to forego United States[] copyright protection, the [condition]

places no burden on the exercise of [First Amendment] rights."  *Id.*; *see also* 619 F. Supp. at 807

(explaining that "[i]n enacting copyright legislation, Congress may attach to its grant of

copyright whatever conditions and restrictions it sees fit") (citing, *inter alia*, *Wheaton*, 33 U.S. at

663-64).  Analogously, here, Plaintiff took voluntary action to seek the benefits of federal

copyright protection and has declined to forego such benefits; compliance with the conditions on

which such benefits are granted thus do not present any First Amendment difficulties.  *See also

Schnapper v. Foley*, 471 F. Supp. 426, 428 (D.D.C. 1979) ("[I]t is well established that there is

no conflict between the First Amendment and the copyright laws."), *aff'd*, 667 F.2d 102 (D.C.

Cir. 1981).

The circumstances of this case are thus far afield from the questions presented in taxation decisions such as *Minneapolis Star* and *Arkansas Writers' Project*.  None of the unusual features of the tax scheme in *Minnesota Star* are presented here.  *See* 460 U.S. at 581-82 (explaining that the state had "not chosen to apply its general sales and use tax to newspapers," but had instead "created a special tax that applie[d] only to certain publications protected by the First Amendment;" that although characterized as a use tax, the special tax did not serve the function of typical use taxes; that the tax departed from the typical state practice of taxing only retail sales rather than the mere use of components such as ink and paper; and that the tax was "tailor[ed] . . . so that it single[d] out a few members of the press").  This case involves neither taxation in general nor the use of a special use tax, and thus does not raise the First Amendment concerns presented in *Minnesota Star*.  *See Walsh v. Brady*, 927 F.2d 1229, 1236 (D.C. Cir. 1991) (describing *Minnesota Star* as "likely addressed only to the special complexities of taxation," and "stand[ing] only for the proposition that states may not use a special scheme to tax the press, even where it gives the press an overall advantage over other taxpayers, because of the difficulties of assessing that defense").

Similarly, *Arkansas Writers' Project* found that a special tax exemption applied by Arkansas to particular types of magazines constituted a "discriminatory tax on the press" because "the magazine exemption means that only a few Arkansas magazines pa[id] any sales tax" and "in that respect, it operate[d] in much the same way as did the $100,000 exemption to the Minnesota use tax" in *Minnesota Star*.  *Id*. at 227, 229.  But what the Court found particularly troublesome was that under the Arkansas tax scheme, "a magazine's tax status depends entirely on its *content*."  *Id*. at 229.  It thus concluded that "[s]uch official scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's

28

guarantee of freedom of the press." *Id*. at 230.  By contrast, this case involves neither taxation

nor content-based discrimination.  And if any doubt were left as to the limited scope of

*Minnesota Star* and *Arkansas Writers' Project*, the court removed such doubt in *Leathers*.

As in *Leathers*, here, Plaintiff's contention that the deposit requirement imposes a

particular burden on one medium (physical books or books published by print-on-demand

publishers) but not others (electronic works that are not published in physical formats), even if

correct, does not state a First Amendment claim.[10]  As the Supreme Court has made clear, the

First Amendment does not cast doubt on otherwise-valid laws that "impos[e] incidental burdens

on speech."  *Sorrell v. IMS Health Inc*., 564 U.S. 552, 567 (2011).  Thus, even if decisions such

as *Minnesota Star* and *Arkansas Writers' Project* did apply outside the taxation context,

"[n]othing about [Congress'] choice" in enacting the deposit requirement "has ever suggested an

interest in censoring the expressive activities" of any medium.  *Leathers*, 499 U.S. at 453.  "Nor

does anything in [the] record indicate" that the deposit requirement "is likely to stifle the free

exchange of ideas."  *Id*.  The deposit requirement thus does not implicate any First Amendment

concerns.

### 2.   In the Alternative, the Deposit Requirement Satisfies Intermediate Scrutiny as Applied to Plaintiff.

The Complaint appears to contemplate the application of a level of review more stringent

than rational basis review to Plaintiff's First Amendment claim.  *See* Compl. ¶¶ 77-78.

---

[10] Furthermore, to the extent that Plaintiff contends that the deposit requirement could affect "speakers who may wish to remain anonymous or who may wish to disseminate their works narrowly," Compl. ¶ 76, that contention fails because Plaintiff does not allege that it falls within either category, and lacks third-party standing to assert First Amendment claims on behalf of any such purported entities.  *See LaRoque v. Holder*, 650 F.3d 777, 781 (D.C. Cir. 2011) (a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties") (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

However, heightened scrutiny is not triggered here because as explained above, "[t]he first amendment does not protect the right to copyright," and therefore, "a condition placed on copyright protection does not implicate first amendment rights."  *Ladd*, 762 F.2d at 815 (footnote omitted).  Indeed, the Ninth Circuit in *Ladd* did not apply any form of heightened scrutiny in analyzing the publisher's First Amendment challenge to the deposit requirement.  Nor, more generally, did the Supreme Court in *Leathers* apply heightened scrutiny when evaluating a First Amendment claim that (like Plaintiff's) alleged that a statute imposed a burden on one medium but not others.  It is therefore unnecessary for the Court to apply heightened scrutiny in adjudicating Plaintiff's First Amendment claim, because no First Amendment rights are threatened.

Nevertheless, even if the Court were to apply a heightened level of scrutiny, the deposit requirement would pass constitutional muster.  Because no viewpoint- or content-based distinction is presented, even if heightened scrutiny were appropriate, at most, intermediate scrutiny would apply.  *See BellSouth Corp. v. FCC*, 144 F.3d 58, 69 (D.C. Cir. 1998) (applying intermediate scrutiny to provision limiting ability of Bell operating companies to provide electronic publishing because "there is simply no hint that 'the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys'" (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994)).  "A regulation will be upheld under intermediate scrutiny 'if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'"  *Id*. at 69-70 (quoting *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189 (1997)).  "The requirement of an important government interest is amply met here."  *BellSouth*, 144 F.3d at 70.  As noted in *Ladd*, the Supreme Court "has recognized without questioning its

30

constitutionality that the deposit requirement's purpose is to enforce contributions of desirable

books to the Library of Congress." *Ladd*, 762 F.2d at 812 (citing *Washingtonian Pub. Co. v.*

*Pearson*, 306 U.S. 30, 41 (1939)); *see also* Study No. 20, at 34 ("Deposits of copyrighted works

serve two purposes: (1) To identify the work for the purpose of copyright registration, and (2) to

provide copies of works for the Library of Congress."). Congress properly conditioned its

decision "[t]o promote the Progress of Science and useful Arts," U.S. Const. art. 1, § 8, cl. 8, on

the deposit of published works in order to maintain a national library to incentivize the

dissemination of existing published works, and "[e]vidence from the founding . . . suggests that

inducing *dissemination*—as opposed to creation—was viewed as an appropriate means to

promote science" under the Copyright Clause. *Golan v. Holder*, 565 U.S. 302, 326 (2012); *see*

*also Ladd*, 762 F.2d at 812 ("[A] provision of the Copyright Act which sustains a national library

for the public use is necessary and proper.").[11]

Furthermore, the deposit requirement does not burden substantially more speech than

necessary to further the government's legitimate interests. The requirement does not close off

any channels for the communication of information. The Copyright Office only issues demands

for deposit of a fraction of works potentially eligible under Section 407, *see* JSF ¶¶ 51-57, and

such demands entail a one-time deposit of two copies of a work. 17 U.S.C. § 407(a). And as

explained above, *see supra* Statutory and Regulatory Background at III, a publisher that believes

that it would be excessively burdensome to comply with a demand that it comply with the

deposit requirement can request a grant of special relief from the Copyright Office. Publishers

---

[11] Indeed, incentivizing public institutions like the Library of Congress regarding the collection of published works that might otherwise be lost is vital to Plaintiff's business model of republishing rare and out-of-print fiction. Plaintiff's business started with the republishing of two rare works held by a public library, the University of Nebraska at Lincoln. JSF ¶¶ 8-11.

frequently request special relief to allow them to submit an electronic copy of a work rather than a physical deposit, and in 2017 and 2018, the Copyright Office granted every special relief request it received.[12]  Especially when viewed in the light of the benefits bestowed under statutory copyright framework, the requirement cannot be said to burden substantially more speech than necessary to further Congress's legitimate interests.  Thus, even if intermediate scrutiny were applicable here—which, as explained above, it is not—the deposit requirement would satisfy that standard.

> **B.    The Deposit Requirement Is Not Facially Overbroad.**

Plaintiff also seeks a ruling from this Court that the deposit requirement is overbroad on its face.  Compl. ¶ 74.  To assert a facial overbreadth claim, a plaintiff must demonstrate that the challenged statute (1) "could never be applied in a valid manner," or (2) that even though it may be validly applied to some, "it nevertheless is so broad that it 'may inhibit the constitutionally protected speech of third parties.'"  *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988).[13]  "[T]he first kind of facial challenge will not succeed unless the court finds that every application of the statute created an impermissible risk of suppression of ideas."  *Id.*  "[T]he second kind of facial challenge will not succeed unless the statute is 'substantially' overbroad, which requires the court to find a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court."  *Id.*  "To put the matter another way, . . . the overbreadth of a statute must not only be

---

[12] Though Plaintiff references the possibility of "less restrictive means" that it posits Congress might have utilized in furtherance of its goals, Compl. ¶ 77, "[i]ntermediate First Amendment scrutiny . . . does not entail a 'least restrictive means' analysis."  *BellSouth*, 144 F.3d at 70 (citation omitted).

[13] The Supreme Court has stated that this latter kind of facial challenge is properly thought of as "an exception to ordinary standing requirements."  *N.Y. State Club Ass'n*, 487 U.S. at 11.

real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."
*Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

Plaintiff cannot succeed under either type of overbreadth challenge.  First, Plaintiff
cannot demonstrate that the deposit requirement could never be validly applied; to the contrary,
as explained above, the provision is consistent with the First Amendment as applied to Plaintiff.
Second, Plaintiff cannot demonstrate that the deposit provision is "substantially" overbroad.  *See*
*Virginia v. Hicks*, 539 U.S. 113, 122 (2003) ("The overbreadth claimant bears the burden of
demonstrating, from the text of [the law] and from actual fact, that substantial overbreadth
exists.").  "The 'mere fact that one can conceive of some impermissible applications of a statute
is not sufficient to render it susceptible to an overbreadth challenge.'"  *United States v.*
*Williams*, 553 U.S. 285, 303 (2008) (quoting *Members of City Council of Los Angeles v.*
*Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)).  Rather, overbreadth analysis inquires
whether the law "taken as a whole, is substantially overbroad in relation to its plainly legitimate
sweep."  *Hicks*, 539 U.S. at 122.

Here, Plaintiff cannot show that there is any "realistic danger that the statute itself will
significantly compromise recognized First Amendment protections of parties not before the
Court."  *Taxpayers for Vincent*, 466 U.S. at 801.  Some form of the deposit requirement has been
in effect since 1790, and there is little indication of a chilling effect on parties who would publish
expressive works were it not for this requirement.  Thus, regardless of whether "one can
conceive of some impermissible application[]" of the challenged provision, the provision is not
"susceptible to an overbreadth challenge," *Williams*, 553 U.S. at 303, and any First Amendment
deficiencies that could spring from other applications of the statute must be cured not by facial
invalidation, but  "through case-by-case analysis."  *Broadrick*, 413 U.S. at 622.  "Moreover,

[Plaintiff] also bring[s] an as-applied claim, and facial challenges are disfavored when a case

'may be disposed of on narrower grounds.'" *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 28 (D.D.C.

2018) (quoting *Texas v. Johnson*, 491 U.S. 397, 403 n.3 (1989)).  The deposit requirement is

therefore not facially overbroad.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter summary

judgment in their favor.

Dated:  July 3, 2019                    Respectfully submitted,


JOSEPH H. HUNT
Assistant Attorney General

ERIC WOMACK
Assistant Branch Director

JESSIE K. LIU
United States Attorney

   /s/  Daniel Riess
DANIEL RIESS (Texas Bar No. 24037359)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C.  20005
Tel: (202) 353-3098
Fax: (202) 616-8460
Daniel.Riess@usdoj.gov
*Attorneys for Defendants*