UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Valancourt Books, LLC

      *Plaintiff,*

              v.

Karyn Temple, et al.,

      *Defendants.*

Civil Case No. 1:18-cv-01922-ABJ

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT**

Robert J. McNamara
Jeffrey Redfern (DC Bar #1018046)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel:  (703) 682-9320
Fax: (703) 682-9321
Email: rmcnamara@ij.org

*Attorneys for Valancourt Books, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

INTRODUCTION ................................................................................. 1

STANDARD OF REVIEW....................................................................... 1

FACTS............................................................................................. 2

ARGUMENT .................................................................................... 11

I.     The mandatory deposit requirement violates the Takings Clause ........... 11

       A.  The mandatory deposit requirement is not a condition placed on a
government benefit.................................................................. 12

            1.  The modern mandatory deposit requirement is not a condition
placed on a government benefit......................................... 13

            2.  The Supreme Court has already rejected the government's
reading of *Monsanto*.......................................................... 16

       B.  Valancourt cannot be compelled to surrender its property simply
because copyright law exists..................................................... 17

            1.  Valancourt was not required to "abandon" its copyright in order
to avoid the mandatory deposit requirement .................................. 18

            2.  The analysis is unaffected by whether Valancourt has benefited
from the existence of copyright law.................................. 21

II.    The mandatory deposit requirement violates the First Amendment........ 24

       A.  The mandatory deposit requirement's burdens on speech are subject
to First Amendment scrutiny ............................................... 25

       B.  The mandatory deposit requirement is subject to strict scrutiny
because it is justifiable only by reference to the content of the
regulated speech and because it is specifically enforced against
publishers based solely on the government's subjective evaluation
of their speech........................................................................... 27

i

C.  The mandatory deposit requirement is overbroad................................ 30

CONCLUSION ..................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013) ................................................................. 25, 26

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .................................................................. 2

*Armstrong v. United States,*
    364 U.S. 40 (1960) ................................................................... 35

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984) ................................................................. 27

*Elsevier B.V. v. UnitedHealth Grp., Inc.,*
    2010 U.S. Dist. LEXIS 3261, No. 09-2124, (S.D.N.Y. January 14, 2010) ....... 17

*Fla. Star v. B.J.F.,*
    491 U.S. 524 (1989) ................................................................. 22

*Horne v. Dep't of Ag.,*
    135 S. Ct. 2419 (2015) ..............................................................*passim*

*Koontz v. St. Johns River Water Mgmt. Dist.,*
    570 U.S. 595 (2013) ................................................................. 26

*Ladd v. Law & Tech. Press,*
    762 F.2d 809 (9th Cir. 1985) .....................................................*passim*

*Leathers v. Medlock,*
    499 U.S. 439 (1991) ................................................................. 35

*Logical Operations, Inc. v. 30 Bird Media, LLC,*
    354 F. Supp. 3d 286 (W.D.N.Y. 2018) .......................................... 5

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) ................................................................. 32, 33

*Nat'l Comics Publ'n, Inc. v. Fawcett Publ'ns, Inc.,*
    191 F.2d 594 (2d Cir. 1951) ...................................................... 18

*New York State Club Ass'n, Inc. v. City of New York,*
    487 U.S. 1 (1988) ................................................................ 31

*\*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) .................................................. 27, 30

*Reichert v. Keefe Commissary Network, LLC,*
    No. 3:17-cv-05848, 2019 U.S. Dist. LEXIS 77814,
    (W.D. Wash. May 8, 2019) ............................................ 20, 21

*\*Ruckelshaus v. Monsanto Co.,*
    467 U.S. 986 (1984) .................................................... *passim*

*Scott v. Harris,*
    550 U.S. 372 (2007) ............................................................ 1

*Se. Ark. Hospice, Inc. v. Burwell,*
    815 F.3d 448 (8th Cir. 2016) ............................................ 20

*Talley v. California,*
    362 U.S. 60 (1960) ............................................................ 33

*Turner Broad. Sys., Inc. v. F.C.C.,*
    520 U.S. 180 (1997) .......................................................... 31

*United States v. Playboy Entm't Grp., Inc.,*
    529 U.S. 803 (2000) .......................................................... 30

*United States v. Stevens,*
    559 U.S. 460 (2010) .................................................... 32, 34

*U.S. Tr. Co. of N.Y. v. New Jersey,*
    431 U.S. 1 (1977) .............................................................. 35

*Virginia v. Hicks,*
    539 U.S. 113 (2003) .......................................................... 31

*Wheaton v. Peters,*
    33 U.S. 591 (1834) .............................................................. 8

## Constitutional Provisions

U.S. Const. amend. I ...................................................... *passim*

## **Statutes**

17 U.S.C. § 104(a) ............................................................................... 13, 14

17 U.S.C. § 104(b)(i) ................................................................................ 14

17 U.S.C. § 407 ...................................................................... 1, 6, 8, 14, 23

17 U.S.C. § 407(d) ................................................................................... 28

17 U.S.C. § 408 ................................................................................... 5, 23

17 U.S.C. § 411 ....................................................................................... 23

17 U.S.C. § 411(a) .................................................................................... 5

Copyright Act of May 31, 1790,
    Ch. 15, § 3, 1 Stat. 124 ...................................................................... 8

Berne Convention Implementation Act of 1988,
    Pub. L. No. 100-568, 102 Stat. 2853 .............................................. 8, 17

Berne Convention, Art. V, § 2,
    https://www.wipo.int/treaties/en/text.jsp?file_id=283698#P109_16834 ......... 15

## **Rules**

Fed. R. Civ. P. 56(a) .................................................................................. 1

Fed. R. Evid. 408 ...................................................................................... 7

## **Other Authorities**

Creative Commons, *CC0: No Rights Reserved*,
    https://creativecommons.org/share-your-work/public-domain/cc0 ................. 19

Library of Congress, *Collection Levels*,
    https://www.loc.gov/acq/devpol/cpc.html ..................................... 28, 29

Library of Congress, *Collections Policy Statements: Literature and Language 2*,
    http://www.loc.gov/acq/devpol/litlang.pdf ........................................ 28

Thomas F. Cotter, *Toward a Functional Definition of Publication in Copyright Law*,
92 Minn. L. Rev. 1724 (2008) ........................................................................ 14

United Kingdom Copyright Service, *Fact sheet P-01: UK Copyright Law*,
https://www.copyrightservice.co.uk/copyright/p01_uk_copyright_law ............. 5

U.S. Copyright Office,
Compendium of U.S. Copyright Office Practices § 2311 (3d ed. 2017) ..... 18, 19

## INTRODUCTION

Defendants have threatened Plaintiff Valancourt Books with hefty fines if it fails to provide the federal government with free copies of the books it publishes. The government's position is that Valancourt, along with every other American publisher, is obliged to provide these books free of charge under 17 U.S.C. § 407 because (and only because) it published books containing new copyrightable material. But Valancourt cannot be compelled to turn over its property without compensation, both because such a requirement violates the Takings Clause of the Fifth Amendment and because the mandatory deposit requirement violates publishers' free speech rights under the First Amendment. At bottom, this case pits Valancourt's fundamental right to retain its property against the government's interest in obtaining that property (which it could freely purchase) without paying for it. Under either the Takings Clause or the First Amendment, this Court must resolve such a dispute in favor of the property owner. Because no material facts are in dispute, summary judgment should therefore be entered in favor of Valancourt.

## STANDARD OF REVIEW

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, federal courts "view the facts and draw reasonable inferences in the light most favorable" to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation marks omitted). Summary judgment should be granted unless there is

sufficient evidence to allow a reasonable factfinder to find for the nonmoving party

on a disputed issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986).

## FACTS[1]

### *Valancourt Books*

Plaintiff Valancourt Books is a two-person publishing firm located in

Richmond, Virginia. Joint Stipulations of Fact (ECF 17-3) ("Joint Stipulations")

¶¶ 4, 23. Through Valancourt, founder James Jenkins and his husband pursue a

simple mission: Finding and bringing forgotten, unloved, and underappreciated

books to a broader audience. Supplemental Statement of Undisputed Facts

("Supplemental Facts") ¶ 1. Valancourt started out as a side project: In 2004, as a

dissatisfied lawyer in Seattle, Washington, Jenkins decided to apply to graduate

school in English Literature. Joint Stipulations ¶ 6. For his required application

essay, he decided to write about an 18th century novelist who had long interested

him: Francis Lathom. *Id.* ¶ 7.

But Jenkins could only find Lathom's works in one location in North America,

the University of Nebraska. *Id.* ¶ 8. Even there, the library did not have his books,

only microfiche versions. *Id.* But James didn't give up: He drove halfway across the

country and borrowed the Lathom microfiche, along with some other out-of-print

books he was interested in. *Id.*

---

[1] The parties have stipulated to most of the relevant facts in this matter. *See* Joint
Stipulation of Facts (ECF 17-3). In support of this motion, Valancourt also submits
a short additional Supplemental Statement of Undisputed Material Facts, which
are not the subject of any stipulations.

This experience got James thinking: There was no reason, in the modern world of low-cost, print-on-demand technology, that classic works of literature should be unavailable. Supplemental Facts ¶ 2. And so James decided to fix the problem himself by publishing two of the titles he had on microfiche: *The Animated Skeleton*, an anonymous gothic novel from 1798, and Francis Lathom's 1795 book *The Castle of Ollada*. Joint Stipulations ¶ 9. Over the course of the next several months, James and his husband painstakingly typed out the manuscripts (using microfiche readers at their local public library), and in March of 2005, Valancourt Books published its first books. *Id.* ¶ 10.

Jenkins named the fledgling operation "Valancourt Books" as a reference both to the dashing hero of Ann Radcliffe's 1794 novel *The Mysteries of Udolpho* and to an essay by W.M. Thackeray during the Victorian era in which he laments that young readers were no longer familiar with Radcliffe's works because, like many great novels, they were out of print. The name Valancourt therefore reflected Jenkins' goal of resurrecting great, forgotten literature. *Id.* ¶ 11.

From there, Valancourt slowly but surely grew, to the point where Jenkins and his husband could quit their jobs and work for the business full-time. It remains, however, a small business: Its staff consists entirely of Jenkins and his husband. Valancourt's s books receive attention from academics and from certain members of the press, but Valancourt still considers a new book a success if it sells as few as 100 copies. *Id.* ¶¶ 13–20. Valancourt frequently brings books back from

the brink of extinction; sometimes Valancourt publishes books that existed in only a single known copy before Valancourt reissued them. *Id.* ¶ 17.

Valancourt survives with relatively low sales volumes because of its print-on-demand business model: Instead of printing books and keeping an inventory on hand, Valancourt uses a third-party vendor called Lightning Source that prints books only when they are ordered. *Id.* ¶¶ 20, 75. When Jenkins himself needs copies of Valancourt's books to display at conferences or for other purposes, he orders them through Lightning Source. *Id.* ¶ 21.

Many of the works that Valancourt publishes are older works in the public domain, though the editorial enhancements that Valancourt adds to the works—such as scholarly introductions and footnotes—are subject to U.S. copyright protection. *Id.* ¶ 24.

Valancourt has never registered the copyright in any of its books or otherwise taken steps to secure legal protection for the copyright in those books. *Id.* ¶ 26. Despite Valancourt's inaction, Jenkins understands that certain elements of each Valancourt book are nonetheless subject to copyright protection. Supplemental Facts ¶ 3; Joint Stipulations ¶ 28. For example, Valancourt's books often include a scholarly introduction or explanatory footnotes to help modern readers understand what a particular cultural reference meant at the time the book was first published. Supplemental Facts ¶ 3. Even the formatting decisions Jenkins makes in laying out the books and deciding which words go where may be protected by copyright.

4

Supplemental Facts ¶ 3.² As a result, Valancourt has historically included true statements in its book about the books' copyright status—not because Valancourt has any intention of suing anyone over those rights, but because Jenkins (a former attorney) thinks making true statements about the law is important. Supplemental Facts ¶ 5; Joint Stipulations ¶ 29.

While Valancourt's books contain copyrightable material, Valancourt itself frequently does not own the copyright in the material it publishes because the material was written by other individuals. Sometimes it publishes material pursuant to a formal licensing agreement, but sometimes not: Many of the professor who contribute copyrightable footnotes or other matter to Valancourt publications do so without any formal written agreement at all. Supplemental Facts ¶ 5. And while this material is copyrighted automatically by operation of law, that copyright is not *enforceable* because it has not been registered. Civil actions for copyright infringement cannot be filed unless the underlying copyright has first been registered (and the copyrighted material deposited) with the Copyright Office pursuant to 17 U.S.C. § 408. *See* 17 U.S.C. § 411(a).

Because Valancourt has never sought to register its copyrights, Valancourt has also never deposited any books with the Library of Congress in exchange for

---

² Layout decisions of this sort are generally protected under the law of the United Kingdom. *See* United Kingdom Copyright Service, *Fact sheet P-01: UK Copyright Law*, https://www.copyrightservice.co.uk/copyright/p01_uk_copyright_law. Under U.S. law, the copyrightability of book layouts is less clear: Layout decisions are sometimes treated as copyrightable elements and sometimes not, depending on the circumstances. *See Logical Operations, Inc. v. 30 Bird Media, LLC*, 354 F. Supp. 3d, 286, 297–98 (W.D.N.Y. 2018) (collecting authorities).

copyright registration. Joint Stipulations ¶ 62. It has, however, deposited some books in the Library: In the early days of Valancourt, Jenkins elected to participate in a Library program called the Cataloging in Publication program, in which publishers exchange free copies of their books for catalog control numbers from the Library. *Id.* Jenkins initially believed this program would help Valancourt sell its books to public libraries. *Id.* After depositing around 100 books, Jenkins decided the program did not help and, in view of the cost of sending the free books to the Library, stopped participating. *Id.*

### *The Demand Notice*

On June 11, 2018, James Jenkins received via email a letter from Michael Lind, an employee of the Copyright Office, notifying him that Valancourt had failed to comply with the mandatory deposit requirements of 17 U.S.C. § 407 and instructing him to immediately provide copies of some 341 Valancourt books on pain of fines. Joint Stipulations ¶¶ 71–73 & Exs. A–C. Despite his years in publishing, this was the first Jenkins had ever heard of the mandatory deposit requirement. Stipulations ¶ 74.

Jenkins was dismayed by this email: The fines were daunting, and the time and expense of complying with this demand would cost him literally thousands of dollars and many hours spent ordering, repackaging, and shipping his books—all to give the Library of Congress books that in many cases Jenkins thought it should already have. Supplemental Facts ¶ 7. Jenkins therefore responded to this email promptly on June 12, 2018, notifying the Copyright Office that (a) as a print-on-

demand publisher, he did not possess these books and would find it extremely expensive to comply with these demands, (b) that most Valancourt books are in fact reprints of long-lost books that surely were deposited with the Library when they were initially published, and (c) that many of the books requested had already been voluntarily deposited with the Library pursuant to Jenkins's earlier participation in the Cataloging in Publications program. Joint Stipulations ¶ 76 & Ex. D.

One month later, the Copyright Office responded, rejecting Jenkins's contention that he should not be required to deposit books that had already been deposited with the Library. Joint Stipulations ¶ 78 & Ex. E. To the extent Valancourt's books contained any new copyrightable material (like explanatory footnotes), Valancourt was required to deposit the book regardless of any earlier editions the Library might have. And to the extent Jenkins had deposited books as part of the Cataloging in Publication program, those deposits did not count towards his mandatory deposit obligations because they were deposited in exchange for a control number, not deposited free of charge.[3] *Id.*

This subsequent notice did, however, reduce the total number of books demanded from 341 to 240. Joint Stipulations ¶ 79. The reason for this reduction is unclear: In the course of this lawsuit, Defendants have asserted that Copyright Office staff "consulted publicly available online sources in an effort to limit the

---

[3] The Copyright Office subsequently, in an effort to settle this lawsuit, offered to allow Valancourt to deposit electronic copies of the demanded books. Joint Stipulations ¶ 61. That settlement offer, of course, does not affect the merits of the case or Valancourt's future obligations under the mandatory deposit law. Fed. R. Evid. 408 (settlement offers not competent evidence of validity or invalidity of claim for relief).

7

demand to books containing newly added material," Joint Stipulations ¶ 77, but in reality the 101 omitted books appear to contain just as much copyrightable material as any other Valancourt book. Supplemental Facts ¶ 8.

### *The Mandatory Deposit Requirement*

The mandatory deposit requirement embodied in 17 U.S.C. § 407 is a vestige of the United States' original system of copyright protection. Under the original system, an author or publisher seeking copyright protection was required to deposit copies of the work to be protected with the federal government as a condition of registering the copyright. Copyright Act of May 31, 1790, ch. 15, § 3, 1 Stat. 124, 125; *see also Wheaton v. Peters*, 33 U.S. 591, 592 (1834). But that is no longer the case. As a result of the United States' entry into the Berne Convention, copyright no longer hinges on registration: Instead, copyright attaches to a new work the moment the work is created. *See generally* Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853. Despite this change, the mandatory deposit requirement persists—but now, instead of a requirement imposed on a publisher who wants to *obtain* copyright, it is imposed on any publisher who publishes a work that is "copyrightable." Joint Stipulations ¶ 43.

The result is a two-tracked system of deposits. If a copyright holder wants to register her copyright (which is necessary in order to actually enforce the copyright in court), she must still deposit copies of the work in exchange for registration—and a deposit made for purposes of registration will generally fulfill the mandatory deposit requirement of § 407. Joint Stipulations ¶ 45. But a publisher that declines

8

the benefits of registration is required to deposit copies of its books anyway.[4] Joint Stipulations ¶ 47.

Most of the books received through the mandatory deposit requirement are deposited based on publishers' complying with the law's command on their own: More than 35,000 books were deposited pursuant to the mandatory deposit requirement in fiscal 2017 alone, most of them deposited without any demand having been made. Joint Stipulations ¶¶ 57, 66. If a publisher fails to deposit copies of its books, the Copyright Office has discretion to demand (as it did in Valancourt's case) that the publisher make the deposits or face fines. Joint Stipulations ¶¶ 50–51. Over a six-year period, the Copyright Office demanded an average of about 4,500 titles per year; by contrast, in 2017 alone, the Office received more than 35,000 books through the mandatory deposit requirement. Joint Stipulations ¶¶ 57, 66.

When the Copyright Office sends demands, it usually does so on its own initiative: Demands are mostly the result of "acquisition teams" within the Copyright Office that conduct internet research and, in their discretion, send out demands when they find a noncompliant publisher whose books the team believes

---

[4] The Copyright Office has discretion to grant "special relief" from the mandatory deposit requirement to publishers who request it, though it has no procedures or forms for accepting requests for special relief or determining whether a publisher has successfully requested special relief. Joint Stipulations ¶ 59. James Jenkins' email that specifically informed the Copyright Office that it would be enormously burdensome to comply with its request was (for no reason Defendants can articulate) *not* deemed a request for special relief. *Id.* ¶ 61. Perhaps unsurprisingly, the Copyright Office receives fewer than 10 communications per year that it deems requests for special relief. *Id.* ¶ 59.

fits within the Library's criteria for acquisition. Joint Stipulations ¶¶ 53–54. About 80 percent of the demands for deposit sent out by the Copyright Office are the result of this sort of staff-driven internet research. Joint Stipulations ¶ 57. On rarer occasions, staff within the Library will themselves identify a book or books that should be added to the Library's collections and ask the Copyright Office to obtain a copy. *Id.*

All of these methods—deposits in exchange for copyright registration, deposits in compliance with the mandatory deposit requirement, and deposits sent as a result of demands by the Copyright Office—result in a huge influx of books. In fiscal 2017 alone, for example, the Copyright Office transferred 172,777 physical books to the Library. Joint Stipulations ¶ 66. Of these, 137,223 were received in exchange for copyright registration and 35,554 were received through the mandatory deposit requirement. *Id.* These books are in addition to other avenues the Library has for book acquisition, such as the Cataloging in Publication program, voluntary gifts, etc.

But the Library does not want all these books—some of them are duplicates of others in the Library's collection, some do not meet the Library's standards for inclusion in its catalog, and some just physically do not fit in the Library's limited space. Joint Stipulations ¶ 67. The Library must dispose of these unwanted books— and so it trades them, gives them away, or simply destroys them. Joint Stipulations ¶ 68. In 2018 alone, the Library traded or gave away more than 80,000 books. *Id.* If books cannot be traded or given away, they are destroyed, and the Library makes

10

no effort to track how many books it destroys. *Id.* Neither does the Library track where these books come from: Many of the tens of thousands of unwanted books disposed of by the Library in 2018 were surely deposited pursuant to the mandatory deposit requirement, but the Library does not know how many or what happened to them. *Id.* ¶¶ 68–69.

## ARGUMENT

The mandatory deposit requirement violates the Constitution in two separate ways. First, it violates the Takings Clause because it is quite literally a taking: It is a command that private businesses like Valancourt surrender their personal property in exchange for no compensation. Second, it violates the First Amendment because it imposes content-based burdens on publishers' speech in pursuit of a governmental interest that is either meaningless or minimal—meaningless in that it results in the government receiving thousands of books that it literally just destroys and minimal in that, to the extent the government wants the books it receives, the government could just as easily have purchased those books on the open market.

### I.    The mandatory deposit requirement violates the Takings Clause.

Valancourt's Takings Clause argument is simple: The mandatory deposit requirement requires it to give free books to the federal government for the government's own use. A requirement that someone turn over their personal property to the government for the government's use is a taking of that property, and a requirement that people do so without compensation is a violation of the

Takings Clause. *See Horne v. Dep't of Ag.*, 135 S. Ct. 2419, 2426 (2015) ("Nothing in the text or history of the Takings Clause, or our precedents, suggests that the [compensation requirement] is any different when it comes to appropriation of personal property. The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home."). As such, the mandatory deposit requirement violates the Takings Clause.

The Government's motion for summary judgment offers only two arguments against this conclusion. First, it asserts that it is not taking Valancourt's books without compensation because Valancourt is required to turn over these books in exchange for the federal government extending the benefit of copyright protection. Mem. Supp. Defs.' Mot. Summ. J. (Defs.' Mem.) at 12–18. Second, it asserts that Valancourt can be required to turn over books because the company has benefited from the copyright system and has failed to somehow take affirmative steps to extricate itself from that system. Defs.' Mem. 19–24. Neither argument is persuasive.

### A.   The mandatory deposit requirement is not a condition placed on a government benefit.

The government argues that the taking of Valancourt's books is not uncompensated at all. Instead, the government says, Valancourt is required to hand over its books as a condition of enjoying the government benefit of copyright protection, relying almost entirely on two cases, *Ladd v. Law & Technology Press*, 762 F.2d 809 (9th Cir. 1985) and *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984). This argument fails for two separate reasons. First, the mandatory deposit

requirement challenged here is meaningfully different from the one upheld in *Ladd*.

Second, the Supreme Court's decision in *Horne v. Dep't of Ag.*, 135 S. Ct. 2419

(2015) squarely rejects Defendants' proposed extension of the reasoning in

*Monsanto*.

### 1. The modern mandatory deposit requirement is not a condition placed on a government benefit.

The first hurdle for the government's argument that the mandatory deposit

requirement is a "condition" placed on the government's grant of copyright is that

Congress has expressly disavowed it: The statutory text plainly states that the

mandatory deposit requirement is not a "condition[ ] of copyright protection." 17

U.S.C. § 104(a). That is enough to stop the analysis: Copyright protection exists

completely independent from the mandatory deposit requirement, and therefore the

mandatory deposit requirement cannot be called a "condition" of copyright

protection.

To resist the plain text of the statute, the government urges this Court to

follow the Ninth Circuit's decision in *Ladd v. Law and Technology Press*, which held

that (statutory command notwithstanding) the mandatory deposit requirement was

in fact "a condition which Congress may legitimately attach to a grant of a benefit"

that a publisher has accepted. 762 F.2d 809, 813 (9th Cir. 1985). But, even if one

accepts *Ladd*'s reasoning entirely, the case cannot control here because the

mandatory deposit requirement has been meaningfully amended since 1985.

In *Ladd*, the Ninth Circuit held that the mandatory deposit requirement was

a lawful condition on the government's grant of copyright—notwithstanding

13

Congress's clear statutory admonition—because copyright protection in 1985 attached only if a work was published with an affirmative notice of copyright. 762 F.2d at 810 n.1; *id.* at 814; *see also* 17 U.S.C. § 407 (1982). As the *Ladd* court saw it, this was still an exchange: Under the original system of copyright (in which mandatory deposit was made in a quid-pro-quo exchange for copyright), a publisher was faced with a choice of either depositing the books or forfeiting the copyright. *Id.* As amended, copyright law in 1985 had "taken away that choice about deposit." *Id.* Instead, "[o]nce publication with copyright notice has occurred, the owner *must* deposit." *Id.* That was enough for the *Ladd* court: Once a publisher "voluntarily sought" the benefit of copyright protection, the government was allowed to impose mandatory deposit as a condition of that benefit. *Id.* at 810.

*Ladd* was wrongly decided: It was simply incorrect to conclude that the law as it stood in 1985 was a voluntary exchange even though it had concededly "taken away [a publisher's] choice about" that exchange. *Id.* at 814. But even if it were perfectly correct at the time, *Ladd* no longer controls today because copyright protection (and therefore mandatory deposit) is no longer invoked by any voluntary act of a publisher. Instead, under modern law, "U.S. copyright subsists in unpublished works . . . *from the moment of creation*[.]" Thomas F. Cotter, *Toward a Functional Definition of Publication in Copyright Law*, 92 Minn. L. Rev. 1724, 1743 (2008) (citing 17 U.S.C. § 104(a)). And copyright continues to subsist once the work is published so long as at least one of the authors is a "national or domiciliary of the United States." 17 U.S.C. § 104(b)(i). As a result, in the Copyright Office's own

words, the mandatory deposit requirement applies to any "*copyrightable*" work published in the United States. Joint Stipulations ¶ 43 (emphasis added). If an author writes a book (or if James Jenkins writes an introduction or an explanatory footnote for Valancourt), copyright attaches at the instant of creation. Effectively, then, the mandatory deposit requirement does not function as a condition on the conferral of copyright. It functions instead as a prohibition on publishing any automatically copyrighted works without also complying with the mandatory deposit requirement.

That statutory change entirely vitiates the reasoning of *Ladd*, which repeatedly invokes the "voluntary[y]" nature of a publisher seeking copyright protection. 762 F.2d at 810, 813–15. Modern copyright law does not condition the enjoyment of copyright protection on any voluntary act by anyone. Indeed, by treaty, it cannot: Article Five of the Berne Convention provides that "[t]he enjoyment and exercise of [copyright in protected works] shall not be subject to any formality[.]" Berne Convention, Art. V, § 2, https://www.wipo.int/treaties/en/text.jsp?file_id=283698#P109_16834. Modern U.S. law assigns copyright protection to all works as a background principle of law; it also assigns mandatory deposit requirements to all works as a background principle of law. There is no condition at all, much less a voluntary one, and so nothing in *Ladd* prevents the straightforward conclusion that Defendants' demand that Valancourt turn over its personal property without compensation violates the Takings Clause.

### 2. The Supreme Court has already rejected the government's reading of *Monsanto*.

The government's argument also fails because the Supreme Court has made clear that government can only demand that people hand over their private property for free without running afoul of the Takings Clause if the property is being turned over *in exchange for* some special government benefit that would otherwise be withheld. *Horne v. Dep't of Ag.*, 135 S. Ct. 2419, 2430–31 (2015). Defendants' brief in this case (like the Ninth Circuit's *Ladd* decision) relies heavily on *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), suggesting it stands for the notion that the government may make demands of property as long as the property owner also receives a benefit. *See Ladd*, 762 F.2d at 813–14; Defs. Mem.' at 12, 14–15, 22–24. But that is simply not so.

In *Monsanto*, the Supreme Court held that the Environmental Protection Agency could require companies manufacturing certain pesticides and other poisons to disclose valuable trade secrets in exchange for a permit to sell those dangerous chemicals. 467 U.S. at 1007. In *Horne*, the Supreme Court clarified that this holding applied because two specific conditions were present in *Monsanto*: The companies were (1) taking part in a "voluntary exchange" in which they received (2) "a license to sell dangerous chemicals" that would otherwise be illegal. *Horne*, 135 S. Ct. at 2430.

Neither condition is met here. First, there is no voluntary exchange: Valancourt has not asked the government for anything at all. And second, the government is not giving Valancourt permission to do anything that would

16

otherwise be illegal—much less permission to sell anything analogous to the "hazardous chemicals" at issue in *Monsanto*. In *Horne*, the Court was clear that the *Monsanto* principle cannot be extended to what it called "basic and familiar uses of property" like building on one's own property or selling raisins in interstate commerce. *Id.* at 2430–31. Valancourt wants to publish books—a use of property as old as Gutenberg and at least as important as selling raisins. The government is free to attach or remove copyright protection to those books—or to condition copyright protections on the provision of free copies,[5] as it did under former law—but it may not treat the right to publish a book as a right it "may hold hostage, to be ransomed by waiver of constitutional protection." *Horne*, 135 S. Ct. at 2430–31. To the extent *Ladd* holds otherwise, it cannot survive *Horne*—and neither can the government's arguments here. Under *Horne*, the mandatory deposit requirement is an unconstitutional taking, and Valancourt's motion for summary judgment should therefore be granted.

## B. Valancourt cannot be compelled to surrender its property simply because copyright law exists.

The government separately argues that its demand that Valancourt turn over its property is not a taking because either (1) Valancourt has failed to somehow

---

[5] Such a requirement would violate the Berne Convention, but courts have generally held that the Berne Convention is not self-executing. *See Elsevier B.V. v. UnitedHealth Grp., Inc.*, 2010 U.S. Dist. LEXIS 3261, No. 09-2124, at *7–*8 (S.D.N.Y. January 14, 2010) (collecting cases). In other words, Congress could violate the Berne Convention if it wanted to. Congress's choice to comply with the Berne Convention rather than continue to condition copyright protection on compliance with mandatory deposit is just that—Congress's choice, binding on the defendants here.

divest itself of the copyright that automatically attached to some of the material in its books or (2) Valancourt itself has benefited from the fact that copyright law exists. Neither argument is correct.

### 1. Valancourt was not required to "abandon" its copyright in order to avoid the mandatory deposit requirement.

There are two separate problems with the government's contention that Valancourt should have avoided the mandatory deposit requirement by somehow "abandoning" the copyright that attached to its books. First, there is no reason to believe that "abandonment" would remove Valancourt's statutory obligation to deposit its books. And second, there is no reason to believe that a person can be required to take affirmative steps in order to *avoid* a "voluntary" transaction.

As an initial matter, there is no authority suggesting that "abandoning" copyright can eliminate the mandatory deposit requirement. There is no statutory provision for abandoning copyright protection; instead, "abandonment" is a judicially created affirmative defense in a copyright infringement action. *See generally Nat'l Comics Publ'n, Inc. v. Fawcett Publ'ns, Inc.*, 191 F.2d 594, 598 (2d Cir. 1951). There is no existing formal mechanism for an author or publisher to "abandon" its copyright. It is true, as the government asserts, that copyright holders are allowed to file statements with the Copyright Office "abandoning" their copyright. Defs. Mem. in Supp. at 22. But the government overlooks the fact that the *Copyright Office itself* does not assert that these statements have any legal effect. U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 2311

(3d ed. 2017) (noting that the Copyright Office will accept such statements but that it will not "offer[ ] any opinion as to the legal effect of the document"). Moreover, it is impossible for Valancourt to *retroactively* abandon its copyright in any of its books for purposes of mandatory deposit: The mandatory deposit requirement was triggered at the moment of publication and would be for any future copyrightable works as well.[6]

Indeed, the difficulty of abandoning copyright underlies the creation of legal devices like the Creative Commons, a nonprofit that designs special licenses allowing copyright holders to permit broader public use of their rights: Creative Commons itself says that its licenses were created because "[d]edicating works to the public domain is difficult if not impossible for those wanting to contribute their works for public use before applicable copyright or database protection terms expire. Few if any jurisdictions have a process for doing so easily and reliably." Creative Commons, *CC0: No Rights Reserved*, https://creativecommons.org/share-your-work/public-domain/cc0.

But even if the government's brief is right (and the Copyright Office's own publications are wrong) and abandoning copyright would have some legal effect

---

[6] "Abandoning" all copyright held in a Valancourt book would also be a tremendous administrative burden. Valancourt does not own the copyright in everything it publishes; in some instances, it has only a license to publish other people's work, and in others it publishes work contributed by friendly scholars without any written agreement at all. Supplemental Facts ¶¶ 5–6. The government's argument is that Valancourt should not be allowed to publish its books unless it can persuade every person involved in creating them to enter into formal agreements abandoning their copyright, despite the fact that Valancourt frequently publishes books without entering into any formal agreements about copyright whatsoever.

here, its argument still fails. The relevant legal question is whether the mandatory deposit is a taking or whether it is instead a voluntary condition of a benefit Valancourt has sought. But faulting Valancourt for not availing itself of an alleged convoluted escape route—and for not somehow persuading everyone else involved in the creation of all of the material in each of its books to formally take that same escape route—is not tantamount to saying Valancourt has voluntarily sought anything at all from the government.

In its own words, the government's argument is that Valancourt has "opted into" the copyright system by dint of the fact that it has failed to "take[ ] steps to divest its copyright interest." Defs.' Mem. in Supp. at 22. But the government points to no case (and Valancourt is aware of no case) holding that the failure to *actively divest oneself of an automatic government benefit* is tantamount to *opting into* that benefit. That is because they are not the same thing.

To the contrary, when courts investigate whether a taking has occurred, their focus is on whether a plaintiff has *voluntarily opted into* a program, not whether a plaintiff has *failed to escape from* a program. *See, e.g.*, *Se. Ark. Hospice, Inc. v. Burwell*, 815 F.3d 448, 450 (8th Cir. 2016) (rejecting claim that government effected a taking by requiring hospital to return payments made above Medicare cap because hospital "voluntarily chose to participate in the Medicare hospice program"). In *Reichert v. Keefe Commissary Network, LLC*, for example, the District of Washington conditionally certified a class action claiming (among other things) that the government effected a taking by returning seized funds to inmates via

"release cards" that carried hefty fees, reducing the amount inmates actually received. No. 3:17-cv-05848, 2019 U.S. Dist. LEXIS 77814, at *2–*4 (W.D. Wash. May 8, 2019). In certifying the class, the court noted that the takings claim hinged on a common question of law: whether the inmates' had "voluntarily" agreed to the government's condition of releasing their money. *Id.* at *25–26 (citing *Horne* and *Monsanto*). To be sure, as the court noted in *Reichert*, there are underdeveloped questions of law regarding when a person's acquiescence to a government condition is truly "voluntary," but there is no support anywhere in the caselaw for the government's argument that Valancourt "voluntarily" acquiesced to mandatory deposit by failing to take (unclear) affirmative steps to escape from it.

### 2. The analysis is unaffected by whether Valancourt has benefited from the existence of copyright law.

Finally, the government contends that Valancourt can be required to turn over its property because it has benefitted from the existence of the copyright system by, for example, signing licensing agreements or including truthful statements about copyright in their publications. But the government points to no evidence that Valancourt has sought any government benefit in exchange for the surrender of its property. Instead, the government argues essentially that Valancourt's business exists in a system where copyright law exists—and so it has sometimes signed licensing contracts that allowed books to be published when other individuals held the copyright and included accurate statements about copyright law in their books. Perhaps Valancourt benefited from this state of affairs—or perhaps Valancourt would have been better off in a system that did not require it to

21

hunt down rights-holders in order to republish out-of-print works. Either way, the only thing the record in this case reveals is that Valancourt followed the law, something that surely cannot now subject it to sanction.

Nor can Valancourt be compelled to comply with the mandatory deposit requirement simply because its books contain accurate statements about copyright. To the extent the government contends otherwise, its argument simply introduces new First Amendment flaws into the system. If it is true, as the government would have it, that Valancourt could publish books protected by copyright without complying with mandatory deposit so long as Valancourt *did not tell anyone* that its books were protected by copyright, then the mandatory deposit requirement simply acts as punishment for making undisputably true statements about the law.[7] *Cf. Fla. Star v. B.J.F.*, 491 U.S. 524, 538 (1989) (warning against "the extreme step of punishing truthful speech").

Moreover, the government's argument here once again runs headlong into the Supreme Court's decision in *Horne*. Even if the government is right to speculate that Valancourt is better off in a system with copyright than it would have been in a system without copyright, exactly the same argument was made and rejected in *Horne*. As Justice Sotomayor pointed out in dissent, the Hornes were not merely selling raisins for a living, they were "selling raisins in a regulated market at a price artificially inflated by Government action in that market." *Horne*, 135 S. Ct. at

---

[7] In *Ladd*, of course, publishers were not being punished for simply stating that copyright protection existed; they were being punished for taking legal steps that resulted in copyright protection in the first place. *See supra* Section I.A.1.

2441 n.2 (Sotomayor, J., dissenting). As such, Justice Sotomayor contended, under *Monsanto* they could be compelled to hand over raisins in direct support of the government program that artificially raised those prices. *Id.* at 2441.

But the majority rejected that argument—as described above, the Court held that *Monsanto* only justifies the confiscation of personal property if the property is taken as a part of a voluntary exchange in which the property owner gets permission to do something otherwise forbidden. *Id.* at 2430.

This case's similarity to *Horne* is underscored by the nature of the "benefit" Valancourt actually derives from copyright law, which is effectively nonexistent. To be sure, some of the material in the books Valancourt publishes is protected by copyright, but that protection is *unenforceable.* 17 U.S.C. § 411; Joint Stipulations ¶ 26. The only way for Valancourt to obtain judicially enforceable copyright protection is to register its copyright (and deposit its books) pursuant to 17 U.S.C. § 408. And, indeed, the existence of § 408 demonstrates exactly the sort of exchange the Supreme Court blessed in cases like *Monsanto* and *Horne*: If a copyright holder registers its copyright under § 408, it is required to give up some of its personal property (by depositing books) and *in exchange* it receives the right to do something it otherwise could not—enforce its copyright in court. By contrast, a publisher required to deposit under § 407 gives up its property and receives nothing back; both before and after the deposit, the publisher's sole "benefit" is the background existence of the copyright system itself.

Simply put, Valancourt's business (like any American business) exists in a regulated market, and Valancourt has therefore conducted itself according to the regulations governing that market—perhaps sometimes to its benefit and sometimes to its detriment. But so too had the plaintiffs in *Horne*, and the Supreme Court categorically rejected the argument that this in any way affected their ability to bring a Takings Clause claim. This Court should do the same, and Valancourt's motion for summary judgment should therefore be granted.

## II.   The mandatory deposit requirement violates the First Amendment.

In addition to being a taking of Valancourt's property, the mandatory deposit requirement also violates Valancourt's First Amendment rights, both on its face and as applied. Below, Valancourt first demonstrates that the government's primary argument—that the mandatory deposit requirement is simply not subject to First Amendment scrutiny—conflicts with binding precedent. It then demonstrates that the mandatory deposit requirement is subject to strict scrutiny both on its face (because it cannot be justified without reference to the content of regulated speech) and as applied (because the government enforces it against publishers based solely on the content of the publishers' speech). Finally, Valancourt shows that the mandatory deposit requirement is overbroad because in most of its applications it imposes burdens on speakers that vastly exceed any benefit to the government.

### A.    The mandatory deposit requirement's burdens on speech are subject to First Amendment scrutiny.

Much of the government's First Amendment argument hinges on the same incorrect assertion as the government's takings argument: that mandatory deposit is actually optional because publishers choose whether to submit books in exchange for copyright protection. If that were true, the government argues, then no First Amendment scrutiny would be triggered. Defs.' Mem. at 25. This is incorrect, for two reasons.

Again, the government's argument hinges almost entirely on the Ninth Circuit's opinion in *Ladd*, which held that the mandatory deposit requirement as it stood in 1985 did not implicate the First Amendment because publishers were voluntarily (if implicitly) agreeing to the mandatory deposit requirement by invoking copyright protection. *See* Defs.' Mem. at 25–28. But this argument is misplaced. First, as explained in detail above, mandatory deposit is, as the name implies, mandatory. No action is required on the part of a publisher to opt into the requirement, and the requirement does not function as any kind of exchange. Accordingly, the government's reliance on *Ladd* is misplaced. *See supra* section I.A.1.

But more broadly, there is simply no support in the caselaw for *Ladd*'s (and the government's) assertion that there are no First Amendment implications where the government trades First Amendment burdens in exchange for government benefits. To the contrary, it is well established that "the government may not place a condition on the receipt of a benefit . . . that infringes upon the recipient's

25

constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 212 (2013) (quotation marks omitted).

Although the unconstitutional conditions doctrine has occasionally proven difficult to apply, two rules have emerged: (1) The government can limit speech within the context of a program it chooses to fund, but not outside of it. *Id.* (2) The government can require a person to give up a constitutional right in exchange for a benefit when there is an "essential nexus" and a "rough proportionality" between the benefit and the right surrendered. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013). Neither rule saves the government here. The government, of course, is not funding any speech at all. Neither is it demanding property in order to offset the costs of some benefit sought by a publisher. It is simply demanding that publishers turn over their physical property in "exchange" for the government's independent and unrelated decision to bestow certain legal protections on intellectual property—protections that in no way hinge on or relate to the surrender of the physical books. Because there is no basis for the government's assertion that the First Amendment does not apply here, its motion for summary judgment should be denied—and, for the reasons stated below, Plaintiff's motion for summary judgment should be granted.

**B.    The mandatory deposit requirement is subject to strict scrutiny because it is justifiable only by reference to the content of the regulated speech and because it is specifically enforced against publishers based solely on the government's subjective evaluation of their speech.**

Although the government's brief asserts in passing that this case does not involve "content-based discrimination," Defs.' Mem. at 29, Defendants' own stipulations and briefing confirm that the mandatory deposit requirement is content-based to its core. It is content-based because it is not "justifi[able] without reference to the content of the regulated speech." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). And it is content-based because Defendants concede that they decide whether a publisher should be fined for noncompliance with the requirement solely by examining the content of the publisher's speech. Accordingly, the deposit requirement is subject to strict scrutiny. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015).

The mandatory deposit requirement is subject to strict scrutiny first because the government cannot justify it without reference to the content of the regulated speech, and strict scrutiny applies "when the purpose and justification for the law are content based[.]" *Id.* at 2228. Here, there can be little question that the government's justifications for the mandatory deposit are content-based. The government has stipulated that the purpose of the mandatory deposit requirement is to help build the collections of the Library of Congress. Joint Stipulations ¶ 35. But, as discussed above, the mandatory deposit requirement sweeps in innumerable books that the Library of Congress does not want in its collections and therefore

27

simply destroys. The true purpose of the requirement is not to obtain those books, but instead (in the government's words) to "enforce contributions of *desirable books* to the Library of Congress." Defs.' Mem. at 31 (quoting *Ladd*, 762 F.2d at 812). Whether a book is desirable, of course, depends entirely on the content of the book. That is sufficient to trigger strict scrutiny.

But the Court's analysis need not stop with the government's justifications because the government concedes that its enforcement of the mandatory deposit requirement hinges entirely on the content of regulated speech. As a matter of law, all copyrightable works are subject to the mandatory deposit requirement, but publishers can only be fined for noncompliance with that requirement if they first receive a demand for compliance from the copyright acquisitions office. 17 U.S.C. § 407(d). And the Copyright Acquisitions Office does not send such demands out at random. Rather, the office staff members determine whether to use their discretion to demand a book by referencing the Library's "Collections Policy Statements" for a particular subject area. Joint Stipulations ¶¶ 51–57. For instance, the Policy Statement on "Literature and Language" states that "[t]he Library collects [comprehensively] all works of American literature, by both established and new writers, which are regarded as having literary merit or as representing current trends in writing." *Library of Congress, Collections Policy Statements: Literature and Language 2,* http://www.loc.gov/acq/devpol/litlang.pdf.[8] The Policy Statements also specify different "levels" of comprehensiveness for different kinds of materials,

---

[8] The government has stipulated that "[t]rue and correct copies" of the Policy Statements are available at www.loc.gov/acq/devpol/cpsstate.html. J. Stip. ¶ 54.

ranging from 0 ("The Library does not collect in this area") to 5 ("A collection which,
so far as is reasonably possible, includes all significant works of recorded knowledge
. . . . The aim, if not achievement, is exhaustiveness."). Library of Congress,
*Collection Levels*, https://www.loc.gov/acq/devpol/cpc.html. While American
literature is collected at Level 5, English literature is collected only at Level 4,
which, while not "comprehensive," is intended to be suitable for academic research.

Applying these collections policies requires that government agents make
subjective determinations about the content of books, such as whether books have
"literary merit," which books "represent[] current trends in writing," and which
books belong in a "research level" or "instructional support level" collection. Only if
the Office determines that acquiring a book is consistent with these policy
statements, or if the library itself requests the book, does the Office issue a demand
letter.

Put differently, Valancourt has been threatened with fines in this matter
because a government employee reviewed its catalog and determined that
Valancourt publishes good books, books worthy of being included in the Library's
catalog. Valancourt would not be subject to fines if that government employee had
instead thought Valancourt published bad books—books that lacked literary merit
or were pornographic. Valancourt, therefore, is being punished based solely on a
government official's evaluation of the content of its speech.

The government may protest that its objective is to preserve and disseminate
valuable speech rather than to suppress it. But whether the legislature's motives

are pure or invidious has no bearing on whether the law is content-based and subject to strict scrutiny. As the Supreme Court explained in *Reed*, "[t]he vice of content-based legislation is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes." *Reed*, 135 S. Ct. at 2229 (quotations marks omitted). A law that burdens all speech in order to catch especially valuable speech is the mirror image of a law that burdens all speech in order to catch disfavored speech. There can be no doubt that if the undisputed evidence showed that the justification for mandatory deposit were to keep tabs on the dissemination of subversive ideas, the law would be subject to strict scrutiny. The same must be true here, even though the particular content-based purpose of the law may be motivated by the government's proclaimed affection for the burdened speech rather than its dislike for it. *See Reed*, 135 S. Ct. at 2231 ("[A] clear and firm rule governing content neutrality is an essential means of protecting the freedom of speech, even if laws that might seem 'entirely reasonable' will sometimes be 'struck down because of their content-based nature.'") (citation omitted); *cf. United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000) ("The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.")

### C.   The mandatory deposit requirement is overbroad.

Ultimately, it does not matter what level of scrutiny this Court applies because the mandatory deposit requirement burdens far more speech than is necessary to advance the government's interests. As such, it is overbroad, and must

30

be struck down under any level of scrutiny. *See Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997) ("A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests").[9]

Here, the government has articulated only one interest supporting the mandatory deposit rule: maintaining the collections of the Library of Congress. With regard to this objective, there are at least three ways that mandatory deposit is overbroad: (1) It applies to all copyrightable books, regardless of whether the Library actually wants them; (2) it applies to speech that is intended to remain anonymous or to be narrowly disseminated; (3) inasmuch as the government has an easy means of acquiring the books it wants—including, but not limited to, buying them—its burdens are totally unnecessary.

*First*, although the government justifies mandatory deposit by pointing out that it is one of the means by which the Library builds its collections, the requirement applies to *all* copyrightable books published in the United States,

---

[9] Although the Supreme Court has previously referred to the First Amendment overbreadth doctrine as "an exception to ordinary standing requirements," *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11, (1988) the Court has since clarified that overbreadth is a merits questions because even if the state *could* burden the plaintiff's speech with a narrowly tailored law, the lack of narrow tailoring makes the specific burden unconstitutional. *See Virginia v. Hicks*, 539 U.S. 113, 120 (2003) ("[W]hether the claimed overbreadth . . . is sufficiently 'substantial' to produce facial invalidity" is not a question of "standing, but the determination of a First Amendment challenge on the merits.") (citations and alterations omitted). Put differently, a law that is overbroad is a law that is not narrowly tailored, and courts evaluating First Amendment claims need not inquire whether a properly tailored law would still reach a particular plaintiff's speech.

regardless of whether the library has any interest in acquiring those books. The Library does not keep comprehensive and granular statistics on where books obtained through different channels end up, but the general numbers are sufficient to demonstrate the overbreadth problem: In 2018 alone the Library gave away 76,129 books, traded 9,752 books to foreign libraries in exchange for other books, and destroyed an unknown number of other "surplus books." Joint Stipulations ¶ 68. Yet from "the first quarter of fiscal 2013 through the first quarter of fiscal 2019," the Copyright Office has demanded just "27,847 books through demand letters." *Id*. While it is true that the Copyright Office transferred 35,554 books to the Library in 2017 that were obtained through mandatory deposit, the Library does not know how many of those books actually made it into collections: Some were given away while others were destroyed. Joint Stipulations ¶ 69. This record plainly establishes that the Library is selective: Thousands or tens of thousands of books are published each year that never end up in the Library's collections. Mandatory deposit therefore reaches far more speech than is necessary to achieve the government's limited objective of maintaining the Library's collections. *See United States v. Stevens*, 559 U.S. 460, 482 (2010) (statute reaching a substantial amount of protected speech was overbroad and unconstitutional).

*Second*, mandatory deposit is also substantially overbroad because it reaches speakers who may wish to publish anonymously or to a narrow audience. Such anonymous speech is legitimate and "is an aspect of the freedom of speech protected

by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342

(1995). As the Supreme Court explained:

> Anonymous pamphlets, leaflets, brochures and even books have played an
> important role in the progress of mankind. Persecuted groups and sects from
> time to time throughout history have been able to criticize oppressive
> practices and laws either anonymously or not at all. The obnoxious press
> licensing law of England, which was also enforced on the Colonies was due in
> part to the knowledge that exposure of the names of printers, writers and
> distributors would lessen the circulation of literature critical of the
> government. The old seditious libel cases in England show the lengths to
> which government had to go to find out who was responsible for books that
> were obnoxious to the rulers. * * * Before the Revolutionary War colonial
> patriots frequently had to conceal their authorship or distribution of
> literature that easily could have brought down on them prosecutions by
> English-controlled courts. Along about that time the Letters of Junius were
> written and the identity of their author is unknown to this day. Even the
> Federalist Papers, written in favor of the adoption of our Constitution, were
> published under fictitious names. It is plain that anonymity has sometimes
> been assumed for the most constructive purposes.

*Talley v. California*, 362 U.S. 60, 64–65 (1960).

The value of anonymous speech is also not limited to situations in which

people may fear political persecution. Individuals may also fear "economic . . .

retaliation," "social ostracism," or loss of privacy, *McIntyre*, 514 U.S. at 342, and the

Court recognizes these as legitimate reasons to speak anonymously. Mandatory

deposit, by forcing copyright holders to identify themselves to the government and

provide the government with a copy of their speech, burdens those who wish to be

anonymous.

The government does not dispute that anonymous speech is protected by the

First Amendment. It argues only that because Valancourt has not alleged that it

wishes for any of its own speech to remain anonymous, it lacks "third-party

standing" to raise these arguments. Br. 29 n. 10. But this misses the mark. In a First Amendment case, a plaintiff does not need "third-party standing" to assert that a speech restriction is overbroad. Instead, Valancourt has standing because it has *itself* suffered an injury because of a law that sweeps far too broadly to survive constitutional scrutiny. *See United States v. Stevens*, 559 U.S. 460, 473 (2010) (holding that a statute unconstitutionally overbroad, without considering whether the speech at issue fell within the statute's "plainly legitimate sweep").

*Finally*, the mandatory deposit requirement is also overbroad because it is completely unnecessary to achieve the governmental objective of maintaining the Library's collections. There is no question that the Library has the right to *purchase* all the books that it wants for its collection, just as every other library does. And it is similarly undisputed that the Library can obtain books through other means as well, as when it receives books in exchange for copyright registration or in exchange for a catalogue number as part of its Cataloging in Publication program. *Supra* at 10. The government's interest, then, is not in *maintaining the Library's collections*. The government's interest is in *obtaining books without providing anything in exchange*.

The only justification for imposing the burden of mandatory deposit on publishers is that it allows the government to save money.[10] The problem is that the

─────────────────

[10] It is not clear from the record how much money the program actually saves the government. The parties have stipulated that the Copyright Office employs roughly a dozen people to conduct "acquisitions," which includes sending demand letters. Joint Stipulations ¶ 48. Nothing in the record reveals how much more it would cost

government is saving money by imposing its own costs on third parties. This is the kind of legislative contrivance that courts view with extreme skepticism because "[a] governmental entity can always find a use for extra money, especially when taxes do not have to be raised." *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 26 (1977). "The Constitution, however, is concerned with means as well as ends." *Horne*, 135 S. Ct. at 2428. When the government acquires property for its own use, it is supposed to pay for it with revenue raised through general taxation. This principle explains why some *taxes* that incidentally burden speech are subject only to a deferential standard of review. *See e.g., Leathers v. Medlock*, 499 U.S. 439, 451 (1991) (noting the "strong presumption in favor of duly enacted taxation schemes"). When the legislature uses means other than taxation to advance its financial interests, courts are appropriately skeptical. *E.g., U.S. Tr. Co of N.Y.*, 431 U.S. at 26 ("If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all."); *Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").

In sum, the mandatory deposit requirement accomplishes three things: (1) It requires the deposit of huge numbers of books that the Library does not want and

---

the government to replace the labor-intensive process of demanding free books with the less labor-intensive process of buying those books through an online retailer.

actually destroys; (2) it coerces anonymous speakers who do not want to sell their books to a wide audience into revealing themselves to the government; and (3) it allows the government to obtain copies of books that are freely available for sale without paying the market price. These wide-ranging burdens on speech cannot be justified by the government's naked desire to avoid paying for books that are freely available for sale.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied and Plaintiff's motion for summary judgment should be granted.

Dated August 2, 2019

Respectfully submitted,

/s/ Robert J. McNamara
Robert J. McNamara
Jeffrey Redfern (DC Bar #1018046)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel:  (703) 682-9320
Fax: (703) 682-9321
Email: rmcnamara@ij.org

*Attorneys for Valancourt Books, LLC*