UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Valancourt Books, LLC<br><br>    *Plaintiff,*<br><br>         v.<br><br>Karyn Temple, et al.,<br><br>    *Defendants.* | Civil Case No. 1:18-cv-01922-ABJ |

**REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Robert J. McNamara
Jeffrey Redfern (DC Bar #1018046)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Emails: rmcnamara@ij.org, jredfern@ij.org

*Attorneys for Valancourt Books, LLC*

## **Table of Contents**

I.   Forcing publishers to surrender their property without compensation
     violates the Takings Clause.................................................................. 1

     A.  The mandatory-deposit requirement is not a voluntary exchange.............. 2

     B.  This Court should not create a new exception to the rule of *Horne* ........... 3

         1.  Valancourt is not required to actively divest itself of copyright
             protection in order to legally publish books....................................... 4

         2.  Valancourt has done nothing that would allow the government
             to demand the surrender of its property ........................................... 7

II.  The mandatory deposit requirement violates the First Amendment ............. 10

     A.  The First Amendment applies .................................................. 11

     B.  The government has failed to refute any of Valancourt's First
         Amendment arguments.............................................................. 14

         1.  The mandatory-deposit requirement cannot be justified
             without reference to the content of the regulated speech .............. 15

         2.  The mandatory-deposit requirement is actually enforced
             based solely on the content of regulated speech ............................. 16

         3.  The mandatory-deposit requirement fails under any level
             of First Amendment scrutiny ......................................................... 19

Conclusion.......................................................................................... 23

In its initial brief, Valancourt Books demonstrated that the federal mandatory-deposit requirement, 17 U.S.C. § 407, violates both the Takings Clause and the First Amendment to the United States Constitution. *See* Mem. of Points and Auth. (ECF 18-1) ("Opening Br."). In their response brief, Defendants fail to refute these arguments. *See* Defs.' Combined Mem. in Supp. of Mot. for Summ. J. and in Opp. to Pls.' Cross-Motion for Summ. J. (ECF 20) ("Defs.' Opp.").[1] Below, Valancourt first explains that the mandatory-deposit requirement violates the Takings Clause because Defendants' arguments cannot explain away the core fact of this case: that the requirement orders publishers to surrender personal property without compensation outside the context of a voluntary exchange for a government benefit. Valancourt then explains that the deposit requirement violates the First Amendment by placing serious burdens on publishers that are both content based and wholly disproportionate to any public benefit.

## I.    Forcing publishers to surrender their property without compensation violates the Takings Clause.

In its opening brief, Valancourt explained that this case is controlled by *Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015), which holds that the Takings Clause forbids the government from demanding that people surrender their personal property as part of a comprehensive regulatory program *unless* that

---

[1] In their original response to Valancourt's motion, Defendants lodged blanket objections to Valancourt's filing of supplemental factual material, incorrectly suggesting that the stipulated facts were intended to comprise the entire record on summary judgment. *See* ECF 20-2; 21-2. In a subsequent filing, Defendants withdrew those objections. *See* ECF 22. Valancourt does not object to the timeliness of Defendants' subsequent filing.

property is being surrendered as part of a "voluntary exchange" for a government

benefit. Opening Br. at 16–17. In response, Defendants first attempt to sidestep the

rule in *Horne* by insisting that the requirement is in fact an "exchange," even

though Valancourt receives nothing in exchange for the books it is required to

deposit. In the alternative, they ask this Court to create an exception to the general

rule of *Horne* and hold that Valancourt can still be punished for failing to comply

with the mandatory-deposit requirement, either because it has failed to actively

divest itself of the copyright protection that automatically attaches to its books or

because it has "benefit[ed]" from the existence of copyright law. None of these

arguments can be squared with the holding of *Horne*, and Valancourt's motion for

summary judgment should therefore be granted.

## A. The mandatory-deposit requirement is not a voluntary exchange.

Defendants spend most of their discussion of the Takings Clause arguing for

a truism: that the government can impose conditions on the enjoyment of

discretionary benefits. Defs.' Opp. at 3–10. Of course it can. The problem for the

government in this case is that it has not done so here. As Valancourt pointed out in

its initial brief, the statute expressly states that the mandatory-deposit requirement

is not "a condition[ ] of copyright protection." 17 U.S.C. § 407; *see also* Opening Br.

at 13–15. Instead, copyright attaches to Valancourt's works automatically by

operation of law, just as with any other new written work. Copyright is not stripped

from Valancourt's works if it fails to comply with the mandatory-deposit

requirement. The mandatory-deposit requirement is simply not an exchange, voluntary or otherwise, and Defendants' assertion to the contrary cannot make it so.

At bottom, Defendants' argument simply cannot be squared with *Horne*. Defendants protest, for example, that the mandatory-deposit requirement exists within a "comprehensive statutory framework[.]" Defs.' Opp. at 4. But so too did the law challenged in *Horne*. 135 S. Ct. at 2424 (describing system under the Agricultural Marketing Agreement Act of 1937). Defendants claim that this overall statutory framework generates benefits for Valancourt to offset the taking, but even if that were true, the same argument was made (and rejected) in *Horne*. *See id.* at 2441 n.2 (Sotomayor, J., dissenting) (arguing that the challenged program increased raisin prices to the benefit of raisin sellers like the Hornes). What is missing here is the same thing missing in *Horne*: a voluntary exchange of private property for government benefit. Without that, the taking of Valancourt's personal property violates the Takings Clause, and Valancourt's motion for summary judgment should therefore be granted.

**B. This Court should not create a new exception to the rule of *Horne*.**

In the alternative, Defendants ask this Court to create an exception to the general rule announced in *Horne*. Specifically, Defendants suggest that (notwithstanding the absence of a true exchange) Valancourt can be punished for failing to comply with the mandatory-deposit requirement because either (1) it has failed to take sufficient steps to divest itself of the benefit the government has

3

unilaterally conferred upon it or (2) it has derived benefits from the general existence of copyright law. Neither exception has any foundation in the caselaw.

## 1. Valancourt is not required to actively divest itself of copyright protection in order to legally publish books.

As explained in Valancourt's opening brief, everything Valancourt publishes contains new copyrightable material in the form of introductions, footnotes, and even artwork or layout decisions. Opening Br. at 4–5. With respect to the hundreds of books at issue in this case, Valancourt created some copyrightable material itself and obtained a license to publish copyrightable material created by third-party scholars, and then it published these books. *Id.*

Defendants contend that this was illegal. What Valancourt should have done (and what Valancourt must do for each book it publishes in the future) is file a "notice of abandonment" with the Copyright Office in order to eliminate all copyright in materials in the book and thereby avoid the mandatory-deposit requirement. Valancourt's failure to do this in the past, Defendants say, means that it can be fined for refusing to surrender its property today. Defs.' Opp. at 14–18.

This argument fails for at least three reasons. First, there is neither legal nor logical support for Defendants' contention that the constitutional requirement of a "voluntary exchange" can be satisfied by a party's failure to divest itself of a unilaterally conferred benefit. Second, Defendants' argument would allow the government to impose huge—and possibly insurmountable—burdens on businesses like Valancourt before they can legally publish books. And finally, there is no reason to believe Defendants' position on abandonment is even legally correct.

***First***, the government's argument simply fails as a matter of law. The Supreme Court has been clear that demands for private property may avoid scrutiny under the Takings Clause only to the extent they are part of a "voluntary exchange." *Horne*, 135 S. Ct. at 2430. And, as demonstrated in Valancourt's opening brief, lower courts applying *Horne* uniformly ask whether a person has voluntarily *opted into* a government program, not whether a person has taken insufficient steps to *escape from* a government program. Opening Br. at 20–21. Defendants' brief provides no case to the contrary and no reason to believe a person can be punished for failing to divest herself of a unilaterally bestowed benefit.

***Second***, the government's brief substantially understates the burdens involved in Valancourt's eliminating copyright protection. Just filing a "notice of abandonment" with the Copyright Office requires a filing fee of $105 (soon to be $125) per book. *See* 84 Fed. Reg. 29135 (June 21, 2019) (supplemental notice of proposed rulemaking raising fee from $105 to $125). Even if Valancourt could file a blanket notice covering all its past publications (which, as discussed below, it cannot), this would mean a separate fee of $125 every single time it publishes a new work. In short, the government's position is that to legally publish books in the United States, Valancourt must either (1) surrender its personal property free of charge, (2) pay a $250 fine, or (3) pay a $125 fee. Valancourt respectfully suggests that the Constitution allows it to publish books without doing any of these things.

Moreover, Defendants' argument fails to grapple with the practical difficulties of their abandonment theory. As laid out in Valancourt's opening brief, it

does not own the copyright in much of the material it publishes. Instead, the copyright is owned by the scholars who write the new material and have given Valancourt a license to publish it. In order to abandon copyright in its books, then, Valancourt would have to re-negotiate these dozens or hundreds of licensing agreements (many of which are unwritten, many years old, or both). As to the books at issue in this case, the difficulty of this task will range from hard in some cases to impossible in others; as applied to future books, it will at minimum dramatically increase the amount of time and expense Valancourt needs to spend negotiating over publishing and copyrights with the friendly scholars who write footnotes or introductions to its books. Opening Br. at 19 & n.6.

The government's only response to this is to suggest that Valancourt itself is not subject to the mandatory-deposit requirement if it does not own the copyright in the material and that the burden of the program would somehow fall on the third-party authors who do own the copyrights. Defs.' Opp. at 16–17. This is wrong: The mandatory-deposit requirement falls on whoever holds the exclusive right to publish the work, not the ultimate copyright owner, and it therefore applies to Valancourt equally whether it owns the copyright in the material in its books or whether the copyright owner has simply licensed to Valancourt its exclusive right to publish. 17 U.S.C. § 407(a).

***Finally***, even if the government could constitutionally impose these burdens before Valancourt can legally publish its books, nothing in the records shows that abandonment would work. Indeed, as Valancourt noted in its opening brief, there is

no sure-fire way to effectively abandon copyright because abandonment is generally recognized only after the fact, when raised as a defense in a copyright-enforcement action, and the Copyright Office itself refuses to assert that the "abandonment notices" on which the government now places so much weight have any legal effect at all. Opening Br. at 18–20 (citing U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 2311 (3d ed. 2017). Defendants' only response to this is to assert that the Copyright Office's statement is "immaterial" and that the Copyright Office would treat such a notice as having the legal effect of negating the mandatory-deposit requirement. Defs.' Opp. at 15. But surely the Copyright Office's own stated policy is at least as material as the citation-free assertions of Defendants' counsel.

Simply put, Valancourt is not required to formally abandon a unilaterally bestowed benefit in order to escape punishment. Valancourt is currently not even legally able to abandon copyright in all the books it publishes. And the notion that a publisher can avoid the statutory deposit requirement by filing a non-binding "notice of abandonment" is, as far as the record reveals, the invention of counsel rather than a statement of any existing government policy. For all these reasons, Valancourt's motion should be granted.

### 2. Valancourt has done nothing that would allow the government to demand the surrender of its property.

In the alternative, the government suggests that Valancourt can be punished for failing to comply with the mandatory-deposit requirement because it has "avail[ed] itself of the benefits" of the federal copyright framework. Defs.' Opp. at

11–14. But as explained at length in Valancourt's brief, all Valancourt has done is operate within the legal system as it exists: Copyright attaches to new works automatically, and so Valancourt has necessarily had to negotiate licenses and agreements that concern copyright. Without licensing agreements, automatic copyright would simply make it illegal to publish anything someone else wrote. Opening Br. at 21–24.

Indeed, in this respect Valancourt is in an even stronger position than the plaintiffs in *Horne*. In that case, it was undisputed that the underlying program raised raisin prices to the direct financial benefit of the Hornes. *Cf. Horne*, 135 S. Ct. 2441 n.2 (Sotomayor, J., dissenting). The Supreme Court found the existence of that financial benefit immaterial to the Takings Clause analysis. *Id.* at 2430–31. Here, by contrast, Valancourt is surely financially helped by the copyright system in some ways and undoubtedly harmed by it in others (in that, for example, it is required to spend time tracking down copyright holders in many older works before re-publishing them in new additions). If the clear benefit to the Hornes could not carry the day, surely the far muddier cost-benefit analysis here can make no difference.

More troublingly, the only real affirmative act Defendants say Valancourt has taken to "avail itself" of the copyright system is that Valancourt's books contain statements about copyright law. No one contends that those statements are false. No one contends that in making those statements Valancourt in any way changed the copyright status of its books. *Cf. Ladd v. Law & Tech. Press*, 762 F.2d 809, 814

(9th Cir. 1985) (placing legal significance on publishers' inclusion of copyright notice where copyright notice itself was necessary to trigger copyright protection). Nonetheless, Defendants claim that they can fine Valancourt simply because it made these statements.

But people cannot be punished for making true statements about government benefits. After all, governments grant all manner of benefits. The government may, for example, grant a special license that allows an individual to sell dangerous chemicals, or to construct a building, or to practice orthodontics. And within certain bounds, the government may impose conditions on these benefits or demand property in exchange for them. *See generally Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987). This means the government can condition the right to practice orthodontics on a person's going to dental school, or demand that a person pay fees in exchange for a license. What the government cannot do, however, is grant these benefits and then prohibit individuals from making truthful statements about them. And courts have held exactly as much: In *Parker v. Kentucky Board of Dentistry*, for example, the Sixth Circuit struck down a Kentucky law under which licensed dentists allowed to practice orthodontics but were prohibited from advertising to the public that they did so unless they also held a specialty license. 818 F.2d 504, 510 (6th Cir. 1987). The court held that dentists had a constitutional right to tell the public they were licensed to perform orthodontics because the statements were "not false, but actually describe[d] procedures which a general practicing dentist is permitted to perform under state law." *Id.*

The government's argument here has exactly the same structure as the law rejected in *Parker*. Congress has unilaterally bestowed copyright protection on Valancourt's publications. And Defendants say that, even if the mine run of publishers could not lawfully be punished for failing to give up their property in response to that unilateral benefit, Valancourt can be—because *Valancourt has told people about the benefit*. This argument simply cannot stand. If the mandatory-deposit requirement cannot survive based on the government's "voluntary exchange" theory (and, as described above, it cannot), it cannot be saved by pointing to Valancourt's truthful statements about underlying legal realities.

## II. The mandatory deposit requirement violates the First Amendment.

In its initial brief, Valancourt demonstrated that the mandatory deposit (1) is subject to strict scrutiny because it is justified based solely on the content of regulated speech; (2) is subject to strict scrutiny because it is enforced based solely on the content of regulated speech; and (3) is unconstitutional under any level of scrutiny because it imposes burdens on speech that are wildly disproportionate to any benefit derived by the government.

In response, Defendants largely fail to grapple with these arguments at all. Instead, they primarily rely on the argument that no First Amendment scrutiny is required at all. *E.g.* Defs.' Opp. at 18. Below, Valancourt briefly restates why the First Amendment applies here. It then explains how the government's brief fails to refute (or in some cases, respond to) Valancourt's actual arguments.

## A. The First Amendment applies.

Defendants suggest that no First Amendment scrutiny applies here at all, either because the mandatory-deposit requirement merely burdens protected speech instead of prohibiting it or because the mandatory-deposit requirement is itself merely a "voluntary exchange" trading books for copyright protection. Each argument is wrong.

First, it is of no moment that the government is burdening Valancourt's speech rather than prohibiting it outright. *See, e.g.,* Defs.' Mem at 19. The Supreme Court has repeatedly recognized that "the distinction between laws burdening and laws banning speech is but a matter of degree and that the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–66 (2011) (citing *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000)) (internal quotations omitted); *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 746 (2011) (holding that the "matching funds" provision of Arizona's campaign finance scheme imposed "evident and inherent" burdens on speech). Economic burdens on speech are subject to First Amendment scrutiny just as outright prohibitions are. *See United States v. Nat'l Treas. Emps. Union*, 513 U.S. 454, 468 (1995) ("Although § 501(b) neither prohibits any speech nor discriminates among speakers based on the content or viewpoint of their messages, its prohibition on compensation unquestionably imposes a significant burden on expressive activity."). Being compelled to give away books—or alternatively to pay fines or fees—is a *burden* on

11

Valancourt's speech, and it must be justified by the government just as surely as would an outright ban.

Similarly, the government is wrong to suggest that it is subject to no First Amendment scrutiny because the mandatory-deposit requirement is merely a voluntary exchange of books for copyright protection. As an initial matter (as explained above), this argument runs aground on the text of the statute itself, which expressly states the mandatory-deposit requirement is not a "condition[ ] of copyright protection." 17 U.S.C. § 407(a). Moreover, even under the Defendants' mistaken theory about copyright abandonment, Valancourt would still have to incur substantial costs in order to avoid this "voluntary exchange." *See supra* at 5–6.

But even if the mandatory-deposit requirement truly were an "exchange," that would be the beginning of the First Amendment analysis, not the end. Any such "exchange" is governed by the unconstitutional-conditions doctrine. *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1377 n.4 (2018) ("The unconstitutional-conditions doctrine prevents the Government from using conditions to produce a result which it could not command directly." (cleaned up)); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("Were it enacted as a direct regulation of speech, the Policy Requirement would plainly violate the First Amendment. The question is whether the Government may nonetheless impose that requirement as a condition on the receipt of federal funds."). In other words, to escape constitutional scrutiny on the basis of an

12

"exchange" theory, the government must satisfy the unconstitutional conditions doctrine, period.

Defendants' brief, for its part, misunderstands the application of the unconstitutional-conditions doctrine and thus provides no explanation for how the Court should go about justifying this burden on speech. At most, the brief argues that no justification is necessary because Defendants are not imposing these burdens in an avowed effort to silence unpopular speech. *See* Defs.' Opp. at 19 ("Thus, if copyright protection were unavailable for people who criticized the government, or for people who refused to advocate particular positions, the doctrine would be implicated."). But this is not the law. To the contrary, courts routinely reject the "exchange theory" and apply First Amendment scrutiny in cases where the government was clearly not trying to promote or suppress ideas. *E.g., Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014) (speech burden could not be justified as a condition on a receipt of a voluntarily sought benefit); *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 438 (5th Cir. 2014) (en banc) (same).

Finally, Defendants rely on a 33-year-old opinion in which the Second Circuit rejected a First Amendment challenge to a now-repealed federal statute that prohibited the importation of copyrighted literary texts that were not printed in the United States or Canada. Defs.' Opp. at 18 (citing *Authors League of Am., Inc. v. Ass'n of Am. Publishers*, 619 F. Supp. 798 (S.D.N.Y. 1985), *aff'd sub nom. Authors League of Am., Inc. v. Oman*, 790 F.2d 220, 221 (2d Cir. 1986). The unusual law in

13

that case is of little relevance here: Beyond being focused solely on where books were printed (rather than imposing burdens on publishing books at all), the law there (unlike the law here) actually functioned as a condition of copyright protection. *Authors League*, 619 F. Supp. at 808 (noting that "noncompliance with [the law] can result in diminution of protection under the copyright law"). The case is best considered in the context of its unusual facts; to the extent Defendants suggest it stands for a broad rule that government may burden speech without regard for the unconstitutional-conditions doctrine, that holding has been superseded by later decisions. *See Agency for Int'l Dev.*, 570 U.S. at 213; *Autor*, 740 F.3d at 183.

Simply put, the First Amendment applies to the burdens the government is imposing on Valancourt's right to publish its books, which means the government is required to justify these burdens. As demonstrated below, the government has not done this, and Valancourt's motion for summary judgment should be granted.

## B. The government has failed to refute any of Valancourt's First Amendment arguments.

In Valancourt's initial brief, it demonstrated, first, that mandatory deposit is subject to strict scrutiny because it is justified based solely on the content of regulated speech; second, that it is subject to strict scrutiny because it is enforced based solely on the content of regulated speech; and finally, that it fails under any level of scrutiny because it imposes burdens on speech that are wildly disproportionate to any benefit derived by the government. Defendants fail to refute

(or, in some cases, acknowledge) these arguments, and so Valancourt's motion for summary judgment should be granted.

### 1. The mandatory-deposit requirement cannot be justified without reference to the content of the regulated speech.

The Supreme Court has repeatedly held that "[g]overnment regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotations omitted, emphasis in original). So contrary to Defendants' arguments, a statute is not automatically content neutral just because the face of the statute does not draw a content-based distinction. *Compare* Defs.' Opp. at 21 (asserting that "the requirement is decidedly content-neutral on its face") *with Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228–29 (2015) (noting that facially neutral laws are still content-based if they cannot be justified without reference to the content of speech). What matters is the statute's *justification*, and Defendants freely admit that "very justification underlying the statute itself," Defs.' Opp. at 24, is to obtain the deposit of "desirable" books for the Library's own collections, Defs.' Opp. at 31. In other words, the justification for the law hinges entirely on the quality—that is, the content—of the books the government wants to obtain.

Defendants attempt to escape this conclusion by redefining the purpose of mandatory deposit as "to sustain a national library by incentivizing the contribution of published works." Defs.' Opp. at 22. But Defendants' own brief belies this assertion, admitting that the government does not actually seek to obtain *all* published works. Defendants do not want (and do not seriously contend that they

want) *all* published works: They want "desirable books." *Id.* at 20. They want the good, important works that are covered by the Library's acquisitions policy statements. Indeed, Defendants give up the game only a few pages later when they contend that the First Amendment does not prevent them from enforcing the mandatory-deposit requirement based on the content of protected speech because they must be allowed "enforce the provision based on the very justification underlying the statute itself." *Id.* at 24. What is that justification? To acquire books "based on the considerations that make it important to have a library." *Id.* at 25.

Simply put, when the government itself describes the justification for the mandatory-deposit requirement, it routinely does so by reference to the content of the regulated speech. This is enough to trigger strict scrutiny. *See Reed v. Town of Gilbert*, 135 S. Ct. at 2228.

### 2. The mandatory-deposit requirement is actually enforced based solely on the content of regulated speech.

As demonstrated in Valancourt's opening brief, although all publishers are required to deposit copyrightable books upon publication, the only publishers who are actually subject to fines for failure to do so are publishers whose books government officials deem "important" under a detailed set of subjective criteria. Opening Br. 28–29. In other words, Valancourt has been threatened with fines because (and only because) of the content of its speech.

The government does not dispute this. Instead, it argues (1) that its enforcement policy should be analyzed under cases governing the government power to buy books for a public library and (2) that it should be allowed to engage in

content-based discrimination as long as its discrimination is germane to the purpose of the underlying statute. Neither argument carries the day.

As an initial matter, it is of course true that the government has broad discretion in determining which books it wants to store in the Library of Congress. *See* Defs. Opp. at 23 & n.10 (citing *United States v. Am. Library Ass'n*, 539 U.S. 194, 204 (2003) (affirming public libraries' broad discretion to determine what to include in their collections)). But this is irrelevant. Valancourt does not object to the government's decision to include or remove any book from its collections. Valancourt objects to the proposition that the government can impose punitive fines on it for failing to turn over copies of its books once a government official deems their contents sufficiently important.

And the government cannot save its content-based enforcement policy by simply asserting that it is enforcing the law in keeping with the content-based purpose of the statute. Defs.' Resp. at 24 & n.12 ("Just as, in the context of restrictions on speech, the government has latitude to draw distinctions based on the factors that render speech proscribable, so too may the government draw distinctions in curating a library based on the considerations that make it important to have a library."). Quite the opposite: The fact that a law has a content-based purpose renders the law itself infirm, *see supra* at 14–16, it does not somehow immunize the government's content-based enforcement from scrutiny. The cases Defendants rely on for this proposition concern those narrow categories of speech that are outside the protection of the First Amendment: obscenity, true threats, and

fighting words. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992); *Virginia v. Black*, 538 U.S. 343, 363 (2003). These cases allow for some degree of content-discrimination *within* those categories of speech that lack any constitutional protection whatsoever, without triggering strict scrutiny. They do not stand for the proposition that the government can engage in content-based discrimination as long as it does so in furtherance of a content-based purpose. If that were the law, the government could nearly always escape strict scrutiny by pointing out that it was making content-based distinctions based on a policy of making content-based distinctions rather than out of ideological hostility. [2]

But the law is not so perverse. *See Reed*, 135 S. Ct. at 2229 (noting that the Court has "repeatedly rejected the argument that discriminatory . . . treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas" (quotation marks omitted)). Instead, the rule is straightforward: A law is content-based if in enforcing it "enforcement authorities must necessarily examine the content of the message that is conveyed" by protected speech. *FCC v. League of Women Voters*, 468 U.S. 364, 383 (1984). Here, the government concedes that this is exactly how it enforces the mandatory-deposit requirement. That is the end of the matter.

---

[2] Defendants also point to *Williams-Yulee v. Florida Bar* for reasons that are unclear. In that case, the Court concluded that a restriction on judicial speech *survived* strict scrutiny because judicial solicitation of campaign contributions was uniquely likely to cause the harm the government was worried about. 135 S. Ct. 1656, 1665 (2015). Nothing in that decision suggests that the government can avoid strict scrutiny here.

### 3. The mandatory-deposit requirement fails under any level of First Amendment scrutiny.

Regardless of the level of scrutiny that applies, the mandatory deposit requirement is overbroad and cannot stand. In its opening brief, Valancourt demonstrated three ways in which the mandatory-deposit requirement is substantially overbroad: It applies to all works, regardless of whether the government wants them, it applies to works that people would prefer to publish anonymously or to a narrow audience, and it is totally unnecessary because the government can acquire the books it wants by buying them. Defendants' responses are either non-sequiturs or unconvincing.

*First*, Defendants do not dispute that the mandatory deposit requirement applies to a great deal of speech that the library does not want or have use for. Undeniably, thousands upon thousands of books deposited in compliance with the mandatory-deposit requirement are simply destroyed. Opening Br. at 10. The government's only justification for this needless destruction is that the mandatory-deposit requirement "neither bans nor prohibits any speech; nor has Plaintiff shown that it has chilled any protected speech." Defs.' Opp. at 25. But this is irrelevant to the analysis. As explained previously, "the distinction between laws burdening and laws banning speech is but a matter of degree." *Sorrell*, 564 U.S. at 565–66. Economic burdens on speech are subject to First Amendment scrutiny, whether or not any specific person is shown to have been silenced. *See Bennett*, 564 U.S. at 746. In sum, the government concedes that it is imposing a real economic burden on a

large group of speakers for no reason, and its only justification is to say that at least these are only burdens and not bans. That answer is legally insufficient.[3]

**Second**, as for the impact of mandatory deposit on those who may wish to publish anonymously or to a narrow audience, Defendants' only response is to point out that they accept deposits under pseudonyms. Defs.' Opp. at 26. But that is no help to people who wish to publish only to a narrow audience; under the mandatory-deposit requirement, a book meant for circulation to a close-knit group of 100 people must be sent to the Library so it can be available to the nation at large, whether the author likes it or not. Again, Defendants provide no justification for this burden.

**Finally**, Valancourt pointed out that the Library has a far less restrictive alternative method of acquiring the books it wants—it can buy them, like everybody else. Defendants apparently agree. Defs.' Opp. at 26. That should settle the First Amendment question. Under strict scrutiny, a law is unconstitutionally overbroad if "less restrictive alternatives would be at least as effective in achieving" the government's objectives. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997). And even under intermediate scrutiny, where the government is not required to choose the *least* restrictive alternative, both the Supreme Court and the

---

[3] The government also suggests that the argument that the mandatory-deposit requirement sweeps too broadly is "directly contrary" to Valancourt's argument that the government imposes fines under the requirement in a content-based manner. Defs.' Opp. at 23–24. But it can simultaneously be true that (1) the mandatory-deposit requirement sweeps too broadly by applying to every publisher, regardless of whether the government has any use for its books and (2) the government violates the Constitution by imposing fines solely on the basis of an official evaluation of the substance of a publisher's speech. That is, after all, exactly what is happening.

D.C. Circuit "have considered the availability of other means" when considering how well tailored a law is. *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1309 (D.C. Cir. 2005) (noting that under intermediate scrutiny, "the availability of other means of accomplishing a governmental objective . . . is probative of whether the government is burdening substantially more speech than is necessary to accomplish that objective"); *accord City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993) ("[I]f there are numerous and obvious less-burdensome alternatives . . . that is certainly a relevant consideration."). Here, the availability of a concededly effective means of building the Library's collections—a means used by every other public library in the country without burdening any speech at all—is fatal.

The government's brief does not explain why it cannot simply buy books at retail. Instead, it suggests that the burdens imposed by the mandatory-deposit requirement are simply not that large because government officials will cheerfully and easily accept low-cost alternatives like electronic copies of books if publishers only ask for "special relief."

Even if this were right, a small burden on publishers would fail in the absence of literally any justification from the government. But it is not right. To the contrary, Defendants attempts to minimize the burdens imposed by mandatory deposit are belied by the record in this case. The government initially sent a notice to James Jenkins demanding that Valancourt turn over some 341 books on pain of fines. Joint Stipulations ¶¶ 71–73 & Exs. A–C. Jenkins promptly responded,

asserting (among other things) that complying with this demand would be a huge burden on his small business and that many of the books in question had already been provided to the Library of Congress through other means. A month later, the government responded with a reduced demand for 240 books (a reduction that has never been explained). *Id.* ¶¶ 77–79; Supplemental Facts ¶ 8.[4] The centerpiece of the government's case for its leniency is that—months after Valancourt found pro bono legal counsel and filed this lawsuit—it offered to settle the case by allowing Valancourt to deposit the 240 books electronically. Defs.' Opp. at 20–21 & n.8. Courts understandably look askance at government agencies beating a strategic retreat once faced with litigation. *Cf. True the Vote, Inc. v. IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016) (noting the heavy burden government defendants bear in establishing that they have voluntarily ceased challenged conduct).

The true measure of the government's conduct is what it actually did in this case—repeatedly demand hundreds of physical books and threaten crippling fines despite Valancourt's protestations—and not what the government's counsel offered in settlement long after litigation commenced. Essentially, the government asks this Court to credit its bare assertions that it will behave more reasonably in the future and leave it with a free hand to make similar demands of Valancourt (or

---

[4] This sequence of events explains the government's assertion that it never or nearly never denies a request for special relief. Defs.' Opp. at 20. That appears to be true only because the government never interprets anything as a request for special relief—James Jenkins's email protesting the burdens of the government's demands did not qualify as a request for "special relief," for reasons the government has been unable to articulate. Whatever the secret sauce is to actually making a request for special relief, fewer than 10 people a year manage to do it. Opening Br. at 9 n.4.

anyone else) in the future. This Court should reject that invitation: The burdens imposed by the mandatory-deposit requirement are both genuine and substantial, and the government has declined to explain why they are being imposed in light of narrower and less burdensome alternatives. That violates the First Amendment.

## CONCLUSION

The government's arguments boil down to the notion that this is all Valancourt's fault. If Valancourt did not want to be stripped of its property or have burdens placed on its speech, Valancourt should have exerted more effort to escape from the copyright system or spent more time begging the government for leniency. But the default rule in our country is that citizens' property is not taken and their speech is not burdened, and courts insist that the government justify doing these things rather than asking citizens to justify their failure to escape from them. The government has refused to do so here, and Valancourt's motion for summary judgment should therefore be granted.

Dated September 13, 2019

Respectfully submitted,

/s/ Robert J. McNamara
Robert J. McNamara
Jeffrey Redfern (DC Bar #1018046)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Emails: rmcnamara@ij.org, jredfern@ij.org

*Attorneys for Valancourt Books, LLC*

23